**In re Lloyd F. UKWU, Respondent.**

**A Member of the Bar of the District of Columbia Court of Appeals (Bar Registration No. 420617).**

**No. 05–BG–788.**

District of Columbia Court of Appeals.

Argued April 4, 2007.
Decided June 21, 2007.

Abraham C. Blitzer, Washington, DC, for respondent.

Wallace E. Shipp, Jr., Bar Counsel, and Judith Hetherton, Senior Bar Counsel, and Traci M. Tait, Assistant Bar Counsel, were on the brief, for the Office of Bar Counsel.

Elizabeth J. Branda, Executive Attorney, for the Board on Professional Responsibility.

Before RUIZ and BLACKBURNE–RIGSBY, Associate Judges, and SCHWELB, Senior Judge.

SCHWELB, Senior Judge:

Having found that Respondent, Lloyd F. Ukwu violated several Rules of Professional Conduct in his representation of five different clients, the Board on Professional Responsibility, through its counsel, has proposed that Respondent be suspended from practice for two years and that reinstatement be conditioned upon proof of fitness to practice and upon payment of restitution, with interest, to three of his clients. This proposal modifies the Board's earlier recommendation of a one-year suspension with the same conditions; the modification is based on legal developments since the Board filed its Report. We adopt the Board's recommendation as modified.

## I.

Respondent was admitted to practice in the District of Columbia on October 13, 1989. Much of his practice has consisted of the representation of foreign nationals in immigration matters. On December 10, 2003, and January 14, 2004, Bar Counsel charged Respondent with violations of various Rules of Professional Conduct in relation to his representation of five clients: Michael Madagu, Malinda Davies, Owanate Davies,[1] Toyin Asegieme, and Esther Tembi. Specifically, Mr. Ukwu was charged with violating several Rules requiring an attorney to represent his clients competently;[2] with intentionally neglecting the matters of all five of his clients;[3] with failing to "act with reasonable promptness" in representing his clients,[4] with failing to communicate to a client the basis for his fee;[5] with violation of his duty of candor toward a tribunal;[6] with engaging in conduct involving dishonesty;[7] and with conduct that seriously interfered with the administration of justice.[8]

Respondent denied all of Bar Counsel's allegations, and an evidentiary hearing was held before an Ad Hoc Hearing Committee on April 13–14, 2004 and on June 1–2,

---

1. Owanate Davies, also known as Owanate Davies–Brony, is the daughter of Malinda Davies.

2. Rule 1.1(a) (providing that a lawyer "shall provide competent representation to a client"); Rule 1.1(b) (requiring a lawyer to serve a client with "skill and care commensurate with that generally afforded to clients by other lawyers in similar matters"); Rule 1.3(a) (a lawyer shall "represent a client zealously and diligently within the bounds of the law"); Rule 1.4(a) (a lawyer shall "keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information"); Rule 1.4(b) ("[a] lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation").

3. Rule 1.3(b)(1) (a lawyer shall not intentionally "[f]ail to seek the lawful objectives of a client through reasonably available means permitted by law and the disciplinary rules"); Rule 1.3(b)(2) (a lawyer shall not intentionally "[p]rejudice or damage a client during the course of the professional relationship").

4. Rule 1.3(c).

5. Rule 1.5(b).

6. Rule 3.3(a).

7. Rule 8.4(c).

8. Rule 8.4(d).

2004. On December 28, 2004, the Committee issued a comprehensive Report and Recommendation in which it found that Respondent had failed to provide competent representation, in violation of Rules 1.1(a), 1.1(b), 1.3(a) and 1.4(a), to any of his five clients. The Committee also found, solely with respect to the representation of Esther Tembi, that Respondent had engaged in dishonesty, fraud, deceit, or misrepresentation, in violation of Rule 8.4(c), and in intentional misconduct, in violation of Rules 1.3(b), 1.4(b), and 3.3(a)(1). The Hearing Committee recommended that Mr. Ukwu be suspended from practice for eighteen months, and that his reinstatement be conditioned upon proof of his fitness to practice and upon payment of restitution, with interest, to Michael Madagu, Toyin Asegieme, and Esther Tembi.

Both Bar Counsel and Respondent filed exceptions to the Hearing Committee's recommendation. On July 29, 2005, the Board on Professional Responsibility filed a detailed Report and Recommendation, a copy of which is attached to this opinion. The Board adopted most of the Hearing Committee's findings, but concluded, on the basis of the facts found by the Hearing Committee, that Bar Counsel had proved violations by Respondent of two additional Rules. Specifically the Board found that Mr. Ukwu had failed to act with reasonable promptness, as required by Rule 1.3(c), and that he had engaged in conduct that seriously interfered with the administration of justice, in violation of Rule

8.4(d). Although the Board found a greater number of violations by Respondent than the Hearing Committee did, it recommended more lenient discipline than that proposed by the Committee. The Board proposed that Mr. Ukwu be suspended from practice for one year, and that reinstatement be conditioned on proof of fitness and on payment of restitution with interest to three clients, as proposed by the Hearing Committee.[9]

Respondent filed exceptions to the Board's Report and Recommendation, contending that Bar Counsel had failed to prove a violation of Rule 8.4(c) (conduct involving dishonesty, fraud, deceit or misrepresentation), that the proposed discipline was too harsh, and that Respondent should receive a suspended sanction conditioned on a term of probation.[10] Bar Counsel likewise filed exceptions contending, *inter alia,* that Respondent had intentionally prejudiced the interests of all five of his clients, in violation of Rule 1.3(b); that he had engaged in dishonesty, fraud, deceit and misrepresentation not only *vis-a-vis* Esther Tembi, but also in his representation of Owanate Davies and Toyin Asegieme, in violation of Rule 8.4(c); that he had seriously interfered in the administration of justice in his representation of Michael Madagu, in violation of Rule 8.4(d); that he had failed to act with candor to the tribunal in his representation of Ms. Asegieme, in violation of Rule 3.3(a)(1); and that Respondent should either be disbarred or suspended from prac-

---

**9.** At oral argument, counsel for the Board advised the court, that, in light of certain legal developments since the Board issued its Report and Recommendation, the Board now favored a longer suspension, up to two years, if the court determined that Respondent testified untruthfully before the Hearing Committee.

**10.** In fact, Respondent was already on probation when he committed many of the viola-

tions to which the present proceedings relate. In *In re Ukwu,* 712 A.2d 502 (D.C.1998) (*Ukwu I* ) he was suspended from practice by this court for commingling client fund and for failure to maintain proper financial records. This sanction was, however, suspended, and Respondent was placed on probation. In 2001, three years after *Ukwu I,* Respondent was also informally admonished by Bar Counsel for failure to provide a statement setting forth the for the basis for his rate or fee.

tice for three years, with reinstatement conditioned upon proof of fitness and payment of restitution with interest.

In our view, the Board's Report taken as a whole, contains a comprehensive, thoughtful and balanced assessment of the charges against Mr. Ukwu. We agree with much, but not with all, of the Board's analysis. Specifically, in order to avoid duplication, we adopt the Board's Report, except to the extent that it is inconsistent with our discussion, in Parts II, III and IV of this opinion, of issues relating to dishonesty, intent, and the appropriate sanction.[11]

## II.

### RULE 8.4(c): DISHONESTY, FRAUD, DECEIT AND MISREPRESENTATION

■ Respondent contends that he did not violate Rule 8.4(c) vis-a-vis any of his clients, and that the Hearing Committee and the Board erroneously found that he had failed to comply with this Rule in his representation of Ms. Tembi. Bar Counsel argues that the Committee and the Board should have found violations of Rule 8.4(c) not only as to Ms. Tembi, but also in the representation of Owanate Davies and Ms. Asegieme. We accept the findings of the Board and the Hearing Committee as to Respondent's conduct while representing Owanate Davies. We think that fur-

ther elaboration is required, however, in the cases of Ms. Tembi and Ms. Asegieme.

### A. Esther Tembi

■ The finding by the Board that Respondent had violated Rule 8.4(c) in his representation of Ms. Tembi was based primarily on the decision of the Hearing Committee to credit the testimony of Ms. Tembi and her friend, Doris Yunmbam, who testified for Bar Counsel, and not that of Respondent, who took the stand on his own behalf. Briefly, Ms. Tembi and Ms. Yunmbam testified that Ms. Tembi had paid Mr. Ukwu $1200 in counsel fees, an amount which had been collected for Ms. Tembi from members of the Cameroonian community. According to Ms. Yunmbam, Mr. Ukwu had counted the money in the women's presence. Respondent, on the other hand, denied that he had ever received the $1200. The Committee also found that Respondent had never written, and that Ms. Tembi had never received, certain letters allegedly warning Ms. Tembi that Respondent would withdraw from her case unless Ms. Tembi paid the $1200.[12]

■ The Hearing Committee having credited the two women and disbelieved Mr. Ukwu, the Board's ultimate findings on the issue were supported by substantial evidence. Accordingly, we sustain the finding of the Board that Respondent violated Rule 8.4(c) vis-a-vis Ms. Tembi.[13]

---

11. A proper understanding of this opinion will require the reader to familiarize himself or herself with the Board's Report, attached hereto. Many parts of the Board's Report with which we agree are not discussed herein, but are at least as important as the parts of the Report with which we disagree.

12. We also note that according to Ms. Tembi, Mr. Ukwu insisted that the disputed amount be paid in cash.

13. Although none of the parties raises the issue, we are troubled by the failure of Bar Counsel to produce a receipt for, or other documentary verification of, the $1200 cash

payment to Mr. Ukwu. The record reflects obvious mistrust between Ms. Tembi and Respondent, and the absence of a receipt arguably merited comment or at least recognition. "Generally, where an indebtedness or obligation to pay has been established, the burden of proving payment is on the party who alleges it, ordinarily the debtor." 70 C.J.S. *Payment* § 73 (2005) (citations omitted), *see Jones v. Hamilton Nat'l Bank of Washington*, 109 A.2d 135, 137 (D.C.1954); *Nightingale v. Leach*, 842 A.2d 1277, 1280 (Me.2004). The conventional means of proving a cash payment is to obtain a receipt, or at least to provide credible documentation. *See, e.g., Heiskell v. Curtis*, 49 App. D.C. 91, 92, 259 F.

## B. *Ms. Asegieme*

■ Either Respondent or an unlicensed assistant in Respondent's office drafted a letter dated January 6, 1999, signed by George Udeozor, Chief Executive Officer of Optimum Care Medical Center, Inc., and addressed to the Immigration and Naturalization Service (INS). This letter read, in pertinent part, as follows:

> Re: Employment Verification for Toyin Asiegeme [sic]
>
> Dear Sir or Madam:
>
> We wish to confirm that Ms. Toyin Asiegeme [sic] referenced above, is currently employed full time by our clinic, and has been since February 1, 1998. Ms. Asiegeme [sic] is a Registered Nurse who has carried our [sic] her duties diligently. Her rate of pay at this time is $18.00 per hour.
>
> Should you have any further questions, you may contact the undersigned.
>
> Sincerely,
>
> Optimum Care Medical Center, LLC

It is undisputed that the contents of this letter were false.[14] Ms. Asegieme was not employed by Optimum on January 6, 1999, nor had she been employed there on February 1, 1998, as asserted in the letter, or at any other time. She had not carried out her duties "diligently," for she had no duties to carry out. Her rate of pay was not $18.00 per hour; indeed, Optimum was not paying her anything.

The Hearing Committee found that this letter "was submitted to INS by Ms. Asegieme pursuant to Respondent's instruction, when she was in fact not then currently employed." The Board, in its Finding of Fact No. 65, wrote that Respondent "assur[ed] Ms. Asegieme that *she should not be concerned* about presenting INS with a letter on Optimum Care Medical Center, LLC letterhead that stated she was currently employed by Optimum—her erstwhile sponsor—when in fact she was not currently so employed." (Emphasis added.) Ms. Asegieme testified unequivocally that Respondent was aware that she was not employed by Optimum, that she expressed her concern to him about the untruthfulness of the statements in the letter, but that Ukwu simply told her not to worry about it.

In spite of the presentation to the INS, at Respondent's direction, of this totally false letter, neither the Hearing Committee nor the Board found that Mr. Ukwu's conduct violated Rule 8.4(c). According to the Hearing Committee, there was "conflicting and uncorroborated testimony on both sides as to whether Respondent was aware of the fact that Ms. Asegieme was not then currently employed." The Committee added that "there is not sufficiently clear and convincing evidence to find a violation." The Board accepted this explanation by the Hearing Committee. We do not agree.

It is true that there was "conflicting testimony." Respondent did in fact, claim that he was unaware that Ms Asegieme was not employed by Optimum. But if—

987, 988 (1919); 70 C.J.S. *Payment* § 41 (2005). The failure on the part of Bar Counsel and of Ms. Asegieme to produce a receipt was surely a relevant consideration. However, "this court has held that official receipts or records are not the only means permissible in evidencing payment of money," *Hemminger v. Scott,* 111 A.2d 619, 620 (D.C.1955) (citing *Ford v. District of Columbia,* 102 A.2d 838 (D.C.1954)), and oral testimony is admissible, and may be sufficient, to prove payment. *Ford,* 102 A.2d at 839. Under the circumstances, and because the parties have not focused on this issue, we do not disturb the findings of the Hearing Committee and the Board.

**14.** We also note that, in the letter, Ms. Asegieme's name is also spelled incorrectly, in two different ways.

and it is a very big if—Mr. Ukwu really had not known, he demonstrably should have known, but he obviously made no effort to find out.[15] It was Respondent who *directed* Ms. Asegieme to present the letter to the INS, and it was therefore his responsibility to know whether the letter was true or false. It cannot be gainsaid that if he had bothered to ask Ms. Asegieme whether she was working for Optimum, and whether she had been so employed since February 1998, as the letter stated, she would have told him that she had not. There is no suggestion in the record that the information in the January 6, 1999 letter came from Ms. Asegieme; on the contrary, the contents were known by Ms. Asegieme to be false. It was Respondent or one of his unlicensed assistants who procured the letter from Optimum, and who required Ms. Asegieme to pay for it (a practice criticized by Bar Counsel's expert witness, Michael Maggio, as inappropriate).[16] The client had nothing at all to do with the securing of the letter, and she testified that Mr. Ukwu even chided her for telephoning Optimum.

▮ Rule 8.4(c) is not to be accorded a hyper-technical or unduly restrictive construction. In *In re Hager*, 812 A.2d 904 (D.C.2002), we stated:

> We have given a broad interpretation to Rule 8.4(c), as recapitulated recently in *In re Arneja*, 790 A.2d 552, 557 (D.C. 2002). "[Dishonesty] encompasses conduct evincing 'a lack of honesty, probity, or integrity in principle; [a] lack of fairness and straightforwardness....'" *In re Shorter*, 570 A.2d 760, 767–68 (D.C. 1990) (per curiam) (citation omitted); *accord, Slattery, supra*, 767 A.2d at 213.

*See In re Carlson*, 745 A.2d 257, 258 (D.C.2000) (per curiam) (dishonesty may consist of failure to provide information where there is duty to do so); *In re Jones–Terrell*, 712 A.2d 496, 499–500 (D.C.1998) (violation found despite "lack of evil or corrupt intent"); *In re Reback*, 487 A.2d 235, 239 (D.C.1985) (per curiam), *vacated but adopted and incorporated in relevant part*, 513 A.2d 226 (D.C.1986) (en banc) (dishonesty in filing second complaint to replace one dismissed because of negligent inattention.). "Dishonesty" is also the most general term in Rule 8.4(c), "encompassing fraudulent, deceitful, or misrepresentative behavior," *In re Wilkins*, 649 A.2d 557, 561 (D.C.1994) (per curiam), but also applying to conduct not covered by the latter three terms, which describe "degrees or kinds of active deception or positive falsehood." *Shorter, supra*, 570 A.2d at 768. Indeed, it has been suggested that sufficiently reckless conduct is enough to sustain a violation of the rule. *Jones–Terrell, supra*, 712 A.2d at 499.

*Id.* at 916; *see also In re Cleaver–Bascombe*, 892 A.2d 396, 404 (D.C.2006) ("an attorney who recklessly maintains inadequate time records, and consciously disregards the risk that she may overcharge a client (or here, the CJA fund), also engages in dishonesty within the meaning of Rule 8.4(c).") Thus, even if Respondent's conduct was in reckless disregard of the truth rather than specifically intended to deceive—a rather dubious hypothesis on this state of facts, and in light of the

---

15. Bar Counsel's expert witness, Michael Maggio, testified that "in an employment-based adjustment of status case like Ms. Asegieme's whether or not she was employed by the petitioning employer is probably the most important question you're going to ask in preparing the case for the interview."

16. The Board found that Ms. Asegieme was required to pay $1,000 for Optimum's letter. Ms. Asegieme testified that Respondent "told me I have to pay $1,500 to the sponsors, which I bargained down to $1,000."

Board's Finding No. 65—he would have violated Rule 8.4(c).

Under these circumstances, the question before us is one of law, subject to *de novo* review. Specifically, we must determine whether, under the standard articulated in *Hager*, a Respondent violated Rule 8.4(c) by directing a client to file with the IRS a letter containing representations that Respondent, at a minimum, should have known were false, and by reassuring her not to worry about it. We conclude as a matter of law that he did.[17]

## III.

## RULE 1.3(b): INTENTIONAL FAILURE TO SEEK THE CLIENT'S OBJECTIVES; INTENTIONAL PREJUDICE OR DAMAGE TO A CLIENT DURING THE COURSE OF THE PROFESSIONAL RELATIONSHIP

■■ Adopting the views of the Hearing Committee, the Board found that Respondent had violated Rule 1.3(b) in his representation of Ms. Tembi, but not in any of the other cases. Bar Counsel contends, to the contrary, that Respondent "intentionally prejudiced the interests of all five of his clients, in violation of Rule 1.3(b)." The issue is a difficult one, and we believe that the Board has recited the evidence comprehensively and impartially. We differ with the Board, however, with respect to an underlying assumption on which its conclusion is apparently based, namely, that the determination whether the neglect was intentional with respect to a particular client must be based solely on the evidence relating to that client. Because we do not accept that premise, we

are unable to agree with the Board's conclusion.

### A. *The evidence*

The Board summarized as follows the evidence relevant to the question whether Rule 1.3(b) was violated in Mr. Ukwu's representation of clients other than Ms. Tembi:

Insofar as relevant to the Rule 1.3(b) charges, the [Hearing Committee's] findings establish that Respondent—

failed in the *Madagu* case to give his client advance notice of an Immigration Court hearing on June 23, 1999, failed to prepare him for the June 1999 hearing, failed to appear at a November 1997 interview, failed to file documentation necessary to support his client's medical reasons for rescheduling a hearing set for May 19, 1999, and failed to appear at a hearing on June 23, 1999;

failed in the *Malinda Davies* case to explain to his client the serious adverse consequences of filing a political asylum claim as he advised, when she had pending an application for "diplomatic asylum" as the widow of a former Nigerian diplomat, failed to explain to his client the purpose of an Immigration court hearing on March 11, 1998 or to "prepare her for what to expect that day," and failed to return his client's repeated telephone calls to "find out about the status of her case";

failed in the *Owanate Davies* case to prepare his client or to appear for a hearing before the Immigration Court on April 5, 1999, for which he also

---

**17.** We reach this conclusion in spite of the fact that Bar Counsel, while criticizing Respondent's entire arrangement with Optimum and the charge of a fee to Ms. Asegieme as improper, has not focused in its brief on Respondent's conduct in assuring Ms. Asegieme that she need not be concerned about the false representation in the letter from Optimum.

failed to prepare his client, failed to file a witness list and failed to submit any documentary evidence;

failed in the *Asegieme* case to withdraw a political asylum claim that previously had been filed by another lawyer, after assuring his client that he would do so, failed to prepare his client for an INS interview scheduled for June 23, 1999, and failed to appear for INS interviews on January 6, 1999 and June 23, 1999.

(Citations to Findings omitted.) The Board also perceptively summarized a feature that all five cases had in common:

A theme running through the five client matters has Respondent failing in every case to prepare the client for an Immigration Court hearing or an INS interview, even failing in some cases to notify the client of a hearing or interview, failing to advise the client what the hearing or interview would be about, failing to return calls from clients who want to get prepared for hearings and interviews and, in some cases, failing even to appear at hearings to represent the client. The Hearing Committee, in four of the five cases attributed those recurrent failures to Respondent's "slipshod" manner and his failure to devote sufficient "time and attention to representing these five clients" (HC Report at 41), *but concluded in each case that the evidence was not sufficient to establish intentional conduct on Respondent's part.*

(Emphasis added.)

The Board then made it clear that, notwithstanding the frequency of neglect, each representation stood on its own footing for purposes of determining whether the neglect was intentional:

With regard to the other failures listed above,[18] Respondent's conduct appears

to have been consistently negligent, as the Hearing Committee found. But the question remains whether those failures are "so pervasive that [Respondent] must be aware of [his neglect]" [*In re*] *Lewis*, 689 A.2d [561], 564 (D.C.1997) (per curiam) [(Appendix Board Report)]. None of the failures, *taken by itself,* was necessarily an intentional failure on the part of Respondent to seek the lawful objectives of his clients. Moreover, the aspects of Respondent's representations that can be said to pervade those cases are his failure to prepare his clients for the hearings and interviews they faced and his failure to return their telephone calls. Neither failing is so prevalent *in any one of the representations* that he must have been aware of it. Neither thus can be deemed to amount to an intentional failure to seek the client's lawful objectives or an intentional prejudicing of the client, the conduct that must be present for a violation of Rule 1.3(b).

(Emphasis added.)

B. *Analysis*

In assessing the determination by the Hearing Committee and the Board that, except as to the Tembi representation, Bar Counsel failed to prove a violation of Rule 1.3(b), we apply our own now-familiar standard of review:

In disciplinary cases, the Board must accept the Hearing Committee's evidentiary findings, including credibility findings, if they are supported by substantial evidence in the record. This court, in turn, must accept the Board's findings of fact, and we also apply the "substantial evidence" standard. *See* D.C. Bar R. XI, § 9(g); *In re Berryman*, 764 A.2d

18. The Board was referring to failures other than those in the Tembi representation, in which both the Hearing Committee and the Board found that the neglect had been intentional.

760, 766 (D.C.2000); *In re Micheel,* 610 A.2d 231, 234 (D.C.1992); *In re Cooper,* 591 A.2d 1292, 1294 (D.C.1991). We review the Board's conclusions of law *de novo. In re Fair* 780 A.2d 1106, 1110–11 (D.C.2001); *In re Berryman,* 764 A.2d at 766; *In re Micheel,* 610 A.2d at 234.

*Cleaver–Bascombe,* 892 A.2d at 401–02.

■ Turning to the substance of what Bar Counsel was required to prove, we note that "while the 'hallmark' of a Rule 1.3(b) violation is that the neglect was intentional, the Rule does not require proof of intent 'in the usual sense of the word.' Rather, 'neglect ripens into an intentional violation when the lawyer is aware of his neglect of the client matter,'" *In re Mance,* 869 A.2d 339, 341 n. 2 (D.C. 2005) (quoting *Lewis,* 689 A.2d at 564); or, put differently, when a lawyer's inaction coexists with an awareness of his obligations to his client. *In re O'Donnell,* 517 A.2d 1069, 1072 (D.C.1986) (per curiam) (adopting Board Report appended to opinion).

■ Significantly, for present purposes, intent may also be inferred where the neglect is "so pervasive that the lawyer must [have been] aware of it." *Lewis,* 689 A.2d at 564. In its brief in this court, the Board has agreed that "the entire fabric of circumstances ... must be evaluated in deciding whether inaction constitutes intentional abandonment." Further, the Board has agreed that "[k]nowing abandonment of a client is the classic case of a Rule 1.3(b)(1) violation." *Lewis,* 689 A.2d at 564.

We have no quarrel with the findings of evidentiary fact made by the Hearing Committee and adopted by the Board with respect to Respondent's intent. As we have previously noted, however, we do not agree with the underlying legal premise on which the Committee and the Board apparently formed their conclusion, namely, that in determining Respondent's intent *vis-a-vis* a particular client, only the record as to that client is to be taken into account.

■ Intent must ordinarily be established by circumstantial evidence, and in assessing intent, the court must consider the entire context. "A play cannot be understood on the basis of some of its scenes, but only on its entire performance." *Andrews v. City of Philadelphia,* 895 F.2d 1469, 1484 (3d Cir.1990). "In discrimination cases, among many others, it is generally in the interests of justice that the trier of fact 'consider the entire mosaic.'" *Carter–Obayuwana v. Harvard Univ.,* 764 A.2d 779, 794 (D.C.2001) (citations omitted). In *In re Shillaire,* 549 A.2d 336 (D.C.1988), a disciplinary proceeding in which the respondent attorney claimed that certain threatening remarks that he had made to a witness, which remarks represented the basis of the charge against him, were an isolated incident, we held that uncharged statements to third parties should have been included in the Board's calculus, because they

"shed light" on the intent with which Shillaire threatened at the courthouse to do in his accuser, and thus "tend reasonably to show the purpose and character of the particular transactions under scrutiny." *FTC v. Cement Institute,* 333 U.S. 683, 705, 68 S.Ct. 793, 92 L.Ed. 1010 (1948). *"Events obscure, ambiguous or even meaningless when viewed in isolation may, like the component parts of an equation, become clear, definitive and informative when considered in relation to other action."* *Local Lodge No. 1424, Int'l Ass'n of Machinists v. NLRB,* 362 U.S. 411, 416 n. 6, 80 S.Ct. 822, 4 L.Ed.2d 832 (1960). Under conventional evidentiary principles, the statements to third parties are surely relevant to Shillaire's motive and intent.

*Drew v. United States,* 118 U.S.App. D.C. 11, 331 F.2d 85 (1964).

*Id.* at 345 (emphasis added).

More recently, in *In re Godette,* 919 A.2d 1157 (D.C.2007), the Hearing Committee found, *inter alia,* that the respondent had purposefully evaded service of a disciplinary complaint by failing to come to his door when a process server knocked at various times of day and night. The Board set aside the Committee's finding, concluding that Bar Counsel had failed to show by clear and convincing evidence that the respondent was at home on any of the occasions when personal service was attempted. In holding, contrary to the Board's view, that the Hearing Committee's finding was supported by substantial evidence, a majority of this court made it clear that the Board should have considered the respondent's repeated earlier failures to answer or acknowledge mail sent to him by Bar Counsel as bearing on the issue whether, thereafter, he deliberately evaded personal service. Relying on *Local Lodge No. 1424* and *Shillaire,* we explained that the respondent's earlier conduct shed light on what had probably really happened when personal service was attempted at the respondent's home. We stated that

> the Hearing Committee was not obliged to attribute to coincidence the failure of anyone to open the door on each of the occasions, on different days, when the process server came to Godette's home.

"Coincidences happen, but an explanation not predicated on happenstance is often the one that has the ring of truth." *Burwell v. United States,* 901 A.2d 763, 770 (D.C.2006) (citations omitted). 919 A.2d at 1166.

Under the "one client-at-a-time" approach apparently utilized in this case by the Hearing Committee and the Board, Respondent's repetition of similar violations in each of the five cases is treated as irrelevant in determining whether intent was proved in any of the other cases. Thus, although, in the Board's words, "[a]theme running through the five client matters has Respondent, [*inter alia*] *failing in every case* to prepare the client for an Immigration Court hearing or an INS interview" (emphasis added), this consistent theme is regarded by the Board as having no bearing on Respondent's intent. In our view, this mode of analysis cannot be reconciled with our decisions in *Shillaire* or *Godette.*[19]

If, as we have concluded, the Hearing Committee and the Board were required to consider the "entire mosaic"—all five representations—in determining whether Rule 1.3(b) was violated,[20] then the finding by the Board regarding the consistent "theme" common to all five cases comes very close to a determination that the "neglect [was] so pervasive that [Respondent] must have been aware of it." Indeed, it would not be unreasonable to conclude,

---

19. We note that *Godette* was decided long after the Board issued its Report, and that the Board, not having a crystal ball, could not have anticipated it. *Godette* is consistent, however, with *Shillaire* and with the authorities on which the court in *Shillaire* relied.

20. We are aware of no authority directly deciding the question whether, where, as here, five cases have been consolidated, evidence tending to show "intent" in any one representation is limited to facts adduced with respect to that representation. In our view, however,

the principles articulated in *Local Lodge No. 1424* and relied on in *Shillaire* and *Godette* lead logically to the conclusion that the Hearing Committee, the Board and the court are all entitled to consider the "entire mosaic," *i.e.,* the attorney's pattern or practice of conduct as reflected in the record. By the same token, the respondent should not be precluded, in an appropriate case, from introducing evidence admissible under the *Local Lodge No. 1424* principle, though of course we leave the particulars of that proposition to a case in which the issue arises.

based on the Board's own findings, that Bar Counsel proved the requisite intent as that term is used in our case law. Nevertheless, and especially since Respondent contested each of the charges of Rule 1.3(b) violations, and the Board and the Hearing Committee have never considered, under the standard set forth in this opinion, Respondent's defenses to the various individual claims of intentional neglect, we conclude that if a finding as to Rule 1.3(b) were essential to the final disposition of this case, a remand to the Board— the action that we took in *Godette*—would be appropriate here. For the reasons set forth in Part IV, *infra*, however, we have determined that under the unusual circumstances of this case, a remand is not necessary.[21]

### IV.

The Board, as we have noted, initially recommended that Respondent be suspended for one year, with reinstatement conditioned upon proof of fitness and on the payment of restitution with interest. At oral argument, however, counsel for the Board indicated (as we understand her representation) that, if the court concludes, based on the findings of the Hearing Committee, that Respondent did not testify

truthfully, then a suspension for two years, with the same conditions for reinstatement, would be appropriate.[22] The revised recommendation resulted from this court's decision in *In re Cleaver–Bascombe* (which was issued after the Board's Report in this case) and on the Board's subsequent recommendation, on remand, of a significantly more severe sanction for the respondent in *Cleaver–Bascombe*. In *Cleaver–Bascombe*, we emphasized that in proposing the appropriate discipline, the Board should have included in its calculus the truthfulness or lack thereof the respondent's testimony before the Hearing Committee. 892 A.2d at 412–13. We relied, in that connection, on *United States v. Grayson*, 438 U.S. 41, 50–54, 98 S.Ct. 2610, 57 L.Ed.2d 582 (1978), in which the Supreme Court held that a criminal defendant's untruthful trial testimony may properly be considered by the sentencing judge in determining the defendant's punishment. The finding by the Hearing Committee, adopted by the Board, that notwithstanding Respondent's denials, Ms. Tembi did pay him $1200 in cash, and that related letters submitted by Respondent were never sent, necessarily means that Respondent's testimony was untruthful; Mr. Ukwu could hardly have "forgotten" that Ms. Tembi paid him in cash.[23]

---

**21.** Respondent effectively admitted, during his testimony before the Hearing Committee, that he had intentionally let his clients appear alone before the Immigration Judge:

> I would never send a client alone, although I did this because it had worked in the past. It was wrong, but it worked in the past, where the client would go alone and just explain to the judge that the attorney is out of the country or is sick, something like that.

Although Respondent claimed that he had discontinued this practice, it appears that one of his clients appeared without representation before the INS at the very time that his attorney, Mr. Ukwu, was before the Hearing Committee in this case.

**22.** Respondent's contention that he should be placed on probation must surely have been

predicated on the supposition that the court would find no Rule 8.4(c) violation (dishonesty). Even if no such violation had been established, such a sanction could not be seriously considered when Mr. Ukwu was already on probation at the time of his misconduct. In any event, we have concluded that Respondent violated Rule 8.4(c) twice, once as to Ms. Tembi and once *vis-a-vis* Ms. Asegieme, and we are of the opinion that the discipline urged upon by Respondent falls well outside the realm of what would be reasonable.

**23.** We do not suggest that every credibility finding in favor of Bar Counsel automatically establishes perjury or false testimony on the part of a respondent whose recollection was different. *See In re R.G.*, 917 A.2d 643, 651 n. 8 (D.C.2007). In this case, however, unintentional failure to recollect a cash payment of

■ Bar Counsel has recommended that Respondent be disbarred *or* suspended from practice for three years (with the same conditions for reinstatement as those proposed by the Board). Bar Counsel's selection of a suspension as one of two alternative proposals, with the lesser of the sanctions emphasized at oral argument, strongly suggests that he is not pressing for disbarment. As we noted in *Cleaver–Bascombe*, 892 A.2d at 412, our disciplinary system is adversarial, and the imposition of a sanction harsher than that proposed by Bar Counsel should be the exception rather than the norm. Under the circumstances here presented, we do not believe that this is an appropriate case for outright disbarment.

■ For the reasons stated by the Board, however, we conclude that, whatever the duration of Respondent's suspension, he must be required to prove his fitness to practice, and to pay restitution with interest, before being reinstated. Indeed, our conclusion that Respondent violated Rule 8.4(c) when he assured Ms. Asegieme that she need not worry about the false statements in the letter from

Optimum, and thus induced her to present a false letter, as well as the substantial evidence that Respondent's pervasive neglect amounted to intentional misconduct, reinforce our view that the sanction in this case should include a proof of fitness requirement. *See generally In re Cater,* 887 A.2d 1, 24 (D.C.2005) (articulating applicable legal standard).[24]

Finally, we consider the appropriate period for which Respondent should be suspended. We note at the outset that the Board is now proposing a suspension for two years, Bar Counsel asks us to add one more year. We take judicial notice, however, of the reality that the process of reinstatement based on an attempted showing of fitness may take approximately eighteen months, and that this "imposes a heavy burden on the disciplined attorney." *In re [Sonya] Steele,* 630 A.2d 196, 201 n. 5 (D.C.1993). Even if Respondent seeks reinstatement, and even if he is successful in proving fitness—a task, as we have noted, that may not be an easy one—he probably will still have been suspended, as a practical matter, for three years or more.

---

$1200, under the circumstances in which that payment was made, is improbable to say the least.

24. We agree, in particular, with the following passage in the Board's Report, and with the expert testimony of Michael Maggio, an expert in immigration law, on which that passage was based:

But the aspects of Respondent's misconduct that bear most heavily on his fitness to practice law are (1) his intentional misrepresentations and abandonment in the *Tembi* case, and (2) his consistent neglect in all five cases to prepare his clients for official interviews and court hearings in political asylum cases. Virtually all immigration clients are "strangers in a strange land." But in cases in which the client is seeking political asylum in the United States, as the expert witness called by Bar Counsel testified, the client "is someone who is pleading

for their [sic] freedom, for their [sic] life." As a consequence in those cases, "you have to take considerable care to prepare your client. You have to sit down and understand the facts of [his or her] case. You have to put together corroborative evidence. You have to usually prepare an affidavit laying [out] your client's case both so that the trial [judge] will see it in writing and also to aid your client to get everything straight and to help yourself getting the case straight." *Id.* at 155–56 (Maggio). The evidence in this matter established that in four political asylum cases—*Madagu,* the two *Davies* cases and the *Tembi* case—Respondent did none of the preparation necessary to serve his client's interests. We regard these persistent failures, together with Respondent's intentional violations under Rules 1.3(b), 3.3(a)(1), 8.4(c) and 8.4(d), as raising considerable question concerning his fitness to practice law.

We are required by D.C. Bar R. XI, § 9(g)(1) to impose the discipline recommended by the Board "unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would be unwarranted." Section 9(g)(1) "endorses the Board's exercise of broad discretion in handing out discipline that is subject only to general review for abuse in that discretion's exercise." *In re Arneja*, 790 A.2d 552, 558 (D.C.2002) (citations omitted); *see also In re Soininen*, 853 A.2d 712, 723 (D.C.2004). The Board's recommended sanction thus "comes to the court with a strong presumption in favor of its imposition." *In re Hallmark*, 831 A.2d 366, 371 (D.C.2003); *Cleaver-Bascombe*, 892 A.2d at 402. "Generally speaking, if the Board's recommended sanction falls within a wide range of acceptable outcomes, it will be adopted and imposed." *Soininen*, 853 A.2d at 723 (quoting *In re Goffe*, 641 A.2d 458, 463–64 (D.C.1994)).

In this case, although the Board did not issue an amended Report and Recommendation, we do not doubt that counsel for the Board had authority to speak for the Board when she indicated that if Respondent testified untruthfully before the Hearing Committee, a two-year suspension would be appropriate and acceptable to the Board. Comparisons between different disciplinary cases are frequently difficult, and this is particularly true in the present instance because of the number of complainants and the complexity of the issues and of some of the findings. Sanctions imposed by the court in this kind of situation have varied in light of the particular facts of each case. Some authority could doubtless be cited for the proposition that the Board's revised recommendation is too lenient, *see, e.g., In re Foster*, 699 A.2d 1110, 1111–12 (D.C.1997) (disbarment) and *In re (Eric) Steele*, 868 A.2d 146, 154–55 (D.C. 2005) (three years suspension with "fitness"); while some cases might be viewed as suggesting that it is too harsh, *see, e.g., In re Ryan*, 670 A.2d 375, 379–81 (D.C. 1996) (four months suspension with "fitness"). In the final analysis, we conclude that the Board's recommended sanction, as revised—suspension for two years, with reinstatement conditioned on proof of fitness and payment of restitution with interest—"falls within a wide range of acceptable outcomes." *Goffe*, 641 A.2d at 463–464. Accordingly, we adopt it.

## V.

## CONCLUSION

For the foregoing reasons, Lloyd F. Ukwu is suspended from practice in the District of Columbia for a period of two years. As a condition of reinstatement at the conclusion of his suspension, Mr. Ukwu must

1. Establish his fitness to practice law pursuant to D.C. Bar R. XI, § 16; and

2. Pay restitution in the following amounts:

 $2,000 to Michael Madagu;

 $5,855 to Toyin Asegieme; and

 $2,000 to Esther Tembi;

 with interest of 6% per annum from the date of each client's payment.

*So ordered.*[25]

## ATTACHMENT

*REPORT AND RECOMMENDATION OF THE BOARD ON PROFESSIONAL RESPONSIBILITY*

These five matters come before the Board on Professional Responsibility on

---

**25.** We direct Respondent's attention to the responsibilities of suspended attorneys as set forth in D.C. Bar. XI, § 14.

review of the Report and Recommendation of an Ad Hoc Hearing Committee. The charges arise from Respondent's representation of five foreign nationals over a four-year period ending in 1999 regarding their cases before the Immigration and Naturalization Service ("INS"), the Immigration Court and the Board of Immigration Appeals ("BIA") under the immigration laws. The Hearing Committee found that he violated four Rules of Professional Conduct—Rules 1.1(a), 1.1(b), 1.3(a) and 1.4(a)—in the course of each representation. With respect to one representation, the Hearing Committee found that Respondent also violated Rules 1.3(b)(1), 1.3(b)(2), 1.4(b), 3.3(a)(1) and 8.4(c). Based on these violations, the Hearing Committee recommended that Respondent be suspended for eighteen months with his reinstatement conditioned upon (1) a showing of fitness to practice law and (2) payment of restitution to three of the former clients wronged by his violations.

Respondent and Bar Counsel both filed exceptions to the Hearing Committee's report. With respect to the violations, Respondent takes issue only with the Hearing Committee's finding that he violated Rule 8.4(c). As for the sanction, he contends that neither the suspension nor the condition that he demonstrate fitness for reinstatement are appropriate. Bar Counsel, on the other hand, urges that, along with the violations found by the Hearing Committee, Respondent be found to have violated additional rules as charged in the specifications of charges and that he be either disbarred or suspended for three years with a fitness requirement, and in either case, required to pay restitution to three of his former clients, with interest, as a condition for his reinstatement.

With regard to the violations as to which the Hearing Committee's findings are in dispute, we agree with the Hearing Committee's finding that Respondent violated Rule 8.4(c) and, in addition, conclude from the Hearing Committee's findings and the evidence that he also violated Rule 1.3(c) and Rule 8.4(d). We recommend that he be suspended for one year with reinstatement conditioned on a demonstration of fitness and payment of restitution to three of his former clients.

## I. FINDINGS OF FACT

Neither Bar Counsel nor Respondent filed any exception specifically directed to the findings of the Hearing Committee. Bar Counsel has requested three additional findings, which are discussed *infra*, pp. 1134–35, and which we decline to make. We therefore generally adopt the findings of the Hearing Committee, with minor exceptions. Those findings are supported by substantial evidence and are restated herein with the record citations given by the Hearing Committee; our exceptions are indicated in footnotes.

### FINDINGS ADOPTED

1. Respondent is a member of the District of Columbia Bar, having been admitted on October 13, 1989 and assigned Bar Number 420617. BX A.

2. Respondent practices through a firm entitled Ukwu & Associates primarily in the field of immigration law, but his practice also includes divorce, criminal law and personal injury. 4 Tr. at 59–60 (Respondent).[1]

1. "4 Tr." refers to the transcript of the June 2, 2004, hearing. "1 Tr." refers to the transcript of the April 13, 2004, hearing; "2 Tr." refers to the transcript of the April 14, 2004, hearing; and "3 Tr." refers to the transcript of the June 1, 2004, hearing.

 

A. COUNT I: MICHAEL MADAGU
(BAR DOCKET NO. 454–99)

3. Michael Madagu, originally from Nigeria, was introduced to Respondent through a friend because he needed assistance in filing a political asylum claim. 1 Tr. at 124–27 (Madagu). Mr. Madagu signed a retainer agreement on October 2, 1997, with Respondent agreeing to prepare and file an application for political asylum on Mr. Madagu's behalf, and he paid a fee of $2,000. 1 Tr. at 128–29, 170 (Madagu); BX 1A, 6A at 2, 6B; 4 Tr. at 82 (Respondent). Respondent filed an asylum application on behalf of Mr. Madagu, dated September 25, 1997, which was stamped received by INS on October 6, 1997. 1 Tr. at 129–30 (Madagu); BX 1B, BX 6A at 2.

4. On October 31, 1997, Mr. Madagu married his girlfriend of more than one year, Vanessa Samuels, a United States citizen. 1 Tr. at 134, 191–92 (Madagu). Respondent was aware that Mr. Madagu had married Ms. Samuels because Mr. Madagu informed him at the time it occurred. 1 Tr. at 135 (Madagu).

5. By notice dated October 28, 1997, INS scheduled Mr. Madagu for an interview on November 18, 1997, in connection with his asylum petition.[2] BX 1C.

6. Respondent did not appear for the asylum interview on November 18.[3] Respondent at no time prior to the scheduled November 18th interview filed for an adjustment of status for Mr. Madagu based on his marriage to Ms. Samuels, although neither the INS nor anybody else ever challenged the *bona fides* of the marriage. 1 Tr. at 133, 135, 199 (Madagu); 208 (Elliot); 3 Tr. at 175 (Maggio). Such a course of action would have been clearly preferable because adjustment of status based on a *bona fide* marriage to a U.S. citizen has a far greater chance of being successful than an asylum application. 3 Tr. at 150 (Maggio).

7. On December 11, 1997, the INS issued a notice stating that it had not granted Mr. Madagu's claim for asylum because he had "failed to appear for [his] scheduled asylum interview, or failed to provide a competent interpreter, and did not show good cause" and referred his case to an Immigration Judge. BX 1E.

8. Respondent's failure to appear at the November 18th hearing led to Mr. Madagu being placed in removal (deportation) proceedings.[4] BX 1E; 1 Tr. at 207 (Elliot); 3 Tr. at 171 (Maggio).

9. By the time Mr. Madagu received a "Notice of Hearing in Removal Proceed-

---

2. The Hearing Committee also found as follows:

> Mr. Madagu testified that Respondent never informed him about the scheduled interview that he did not learn of it until after he eventually retained new counsel and that he did not attend the interview. 1 Tr. at 131–34; 186–87 (Madagu).

The Hearing Committee qualified its finding by noting that "[c]ontradictorily, Mr. Madagu signed a statement prepared by his successor attorney (BX 1N at 56) and Respondent sent a letter and a form to INS both suggesting that Mr. Madagu did appear at the November 18th interview. BX 1D." HC Report at 4 n. 3. We omit the quoted sentence because, while it accurately relates Mr. Madagu's testimony, the facts to which he testified are contradicted by other evidence in the record and the Hearing Committee makes no finding of those facts.

3. The first sentence in Hearing Committee's Finding 6 reads as follows:

> In all events, Respondent does not contend that he appeared for the asylum interview on November 18th. 4 Tr. at 88 (Ukwu).

We have revised that sentence because what Respondent does not contend is immaterial. The material fact is that he did not appear.

4. The Hearing Committee's Finding 8 reads as follows:

> Respondent's failure to appear at the November 18 th hearing, *and the lack of a pending adjustment of status petition at the time of the scheduled asylum interview,* led to Mr. Madagu being placed in removal (deportation) proceedings. BX 1E; 1 Tr. at 207 (Elliot); 3 Tr. at 171 (Maggio) (emphasis added.)

ings" in Immigration Court, dated February 11, 1998, which scheduled a Master Hearing on June 24, 1998 (BX 1F), Respondent, at Mr. Madagu's request, had applied for an adjustment of status (green card) for Mr. Madagu based on his marriage to Vanessa Samuels. 1 Tr. at 134–35, 138, 141 (Madagu); BX 1N at 45. The June 24th hearing ultimately was rescheduled, although Respondent did not explain to Mr. Madagu why it was rescheduled. 1 Tr. at 138–39 (Madagu).

10. On February 24, 1999, the Immigration Court issued a "Notice of Hearing in Removal Proceedings" setting a hearing for May 19, 1999. BX 1G; 1 Tr. at 140 (Madagu). Respondent did not prepare Mr. Madagu for the hearing. 1 Tr. at 142 (Madagu).

11. The May 19th hearing did not go forward because Mr. Madagu was ill. 1 Tr. at 143 (Madagu). Mr. Madagu had seen a doctor on May 14th for a respiratory problem and informed Respondent that he would be unable to attend the hearing. 1 Tr. at 145–46 (Madagu); BX 1O at 67. Respondent attended the hearing and afterward informed Mr. Madagu that the hearing would be rescheduled and that he would be notified of the new date. 1 Tr. at 147 (Madagu); 4 Tr. at 91–92 (Respondent).

12. Respondent did not, however, inform Mr. Madagu that the Immigration Court had specifically stated that Mr. Madagu's failure to appear would be excused, and the prejudice that normally occurs when a person fails to appear in Immigration Court would be waived, only upon the filing of an affidavit of explanation, which in this case might include producing a

doctor's letter verifying the illness. BX 1K at 35, n. 2; 1 Tr. at 158–59 (Madagu), 212 (Elliot); 4 Tr. at 92 (Respondent).

13. On May 19th, the Immigration Court also issued a "Notice of Hearing in Removal Proceedings" setting a hearing for June 23, 1999, at 1:00 p.m. BX 1H. The Notice was sent to Respondent, not Mr. Madagu. BX 1H. Respondent did not send a copy of the notice to Mr. Madagu, or tell him that he needed to show up or in any way otherwise prepare him for the rescheduled hearing. 1 Tr. at 149–51 (Madagu).

14. Despite a number of calls to Respondent's office over a period of time, it was not until June 23rd that Mr. Madagu learned from Respondent's office that his hearing had been scheduled for that day. 1 Tr. at 149–52 (Madagu). Mr. Madagu was again sick on that date. Neither Respondent nor anyone from his office appeared at the hearing that day. 1 Tr. at 153–54 (Madagu), 211–12 (Elliot); 4 Tr. at 94–95 (Respondent). No motion for continuance was filed. 1 Tr. at 212–13 (Elliot). Respondent never informed Mr. Madagu that he would not be representing him that day or that he expected Mr. Madagu to appear on his own. 1 Tr. at 211–13 (Elliot). Respondent was out of the country on that date. 1 Tr. at 154 (Madagu); 4 Tr. at 94 (Respondent). If someone had appeared on Mr. Madagu's behalf that day and informed the Court that they were still awaiting adjudication of Mr. Madagu's adjustment of status petition, it is quite likely that the matter would have been continued.[5] 4 Tr. at 94 (Respondent).

We have deleted the italicized words because they are not supported by substantial evidence in the record as a whole.

5. The last sentence in the Hearing Committee's Finding 14 is introduced by the phrase

"[b]y Respondent's own admission." We do not adopt that phrase because it is not supported by substantial evidence in the record as a whole.

15. Based on the failure of anyone to appear at the June 23rd hearing the Immigration Judge entered an order, finding that Mr. Madagu had abandoned any and all claims for relief from removal and therefore should be removed from the United States. BX 1I. Persons ordered deported *in absentia* for failure to attend their immigration hearing are statutorily barred from various forms of relief from deportation, including adjustment of status to permanent resident based on marriage to a U.S. citizen, the immigration benefit Mr. Madagu had most recently retained Respondent to seek on his behalf. 3 Tr. at 160–61 (Maggio).

16. [Omitted][6]

17. Upon learning of the deportation order, Mr. Madagu met with Respondent. They discussed filing a motion to reopen the proceedings and Respondent asked Mr. Madagu to obtain a medical certificate that he was ill for both the May and June hearings. 1 Tr. at 158–59 (Madagu).

18. Respondent filed a "Motion to Reopen and Stay Deportation Pending Adjudication," seeking to excuse the failure of both Respondent and Mr. Madagu to appear at the June 23rd hearing based on both Mr. Madagu's medical condition and the fact that Respondent had been detained on a trip to Africa because he had been hospitalized with malaria. BX 1J.

19. The Motion to Reopen and Stay was denied. BX 1K. The Immigration Court specifically noted that after Mr. Madagu failed to appear at the May 19th hearing, the Court had advised Respondent that the absence would be excused only if Mr. Madagu filed an affidavit of explanation, but no such affidavit was filed until after the June 23rd hearing date and then only in connection with the Motion to Reopen and Stay. BX 1K, p. 35, n. 2.

20. Respondent appealed the Immigration Court's decision to the Board of Immigration Appeals. BX 1L.

21. Thereafter, Mr. Madagu decided to retain new counsel, Thomas Elliot (1 Tr. at 165 (Madagu)), whom he authorized to file an appeal on his behalf. BX 1M. In connection with the appeal, Mr. Elliot filed a Brief and Motion to Supplement Record, based on exceptional circumstances, which, as argued by successor counsel, was a claim of ineffective assistance of counsel (BX 1N; 1 Tr. at 225–28 (Elliot)) and a letter to further supplement the record with additional evidence. BX 1O. As compared with the Motion to Reopen filed by Respondent, these materials included a note from Mr. Madagu's treating doctor containing the dates of treatment, actual medical records and notes and a letter from Mr. Madagu's employer confirming his absence from work for sickness on the dates of his two missed hearings. *Compare* BX 1N & 1O *with* BX 1J; *see also* 1 Tr. at 216–217 (Elliot). Mr. Madagu's successor attorney also filed an affidavit from Mr. Madagu's wife further documenting the claim of ineffective assistance of counsel. BX 1Q; 1 Tr. at 215 (Elliot).

22. Although such motions are rarely granted (BX 1M–1N; 1 Tr. at 217–18 (Elliot)), Mr. Madagu's appeal was successful; the Board of Immigration Appeals rescinded the *in absentia* deportation order based on "exceptional circumstances" and re-

---

**6.** The Hearing Committee's Finding 16 reads as follows:

> Mr. Madagu did not timely receive a copy of the deportation order. 1 Tr. at 154–55 (Madagu).

We do not adopt that finding because it is not supported by substantial evidence in the record as a whole.

manded to the Immigration Court for further proceedings. BX 1R.

23. Nonetheless, despite his six-year marriage to an American citizen and the relatively routine nature of such applications in the case of *bona fide* marriages, Mr. Madagu still had not received his green card as of the date of the hearing in these matters. 1 Tr. at 198–99 (Madagu); 3 Tr. at 151 (Maggio).

### B. COUNT II: MALINDA DAVIES (BAR DOCKET NO. 189–99)

24. Malinda Davies, originally from Nigeria, is the widow of a former Nigerian diplomat. 2 Tr. at 8 (Davies).

25. In May 1989, the Davies family, including Mrs. Davies through her late husband, and her daughter, Owanate, had applied for lawful permanent residence pursuant to Section 13 of the Act of September 11, 1957. BX 2A.

26. Section 13 authorizes 50 immigrant visas (i.e. "green cards") per year for former diplomats and their family members who can show compelling reasons why they cannot return to their home country. 2 Tr. at 164 (McHugh–Martinez); 3 Tr. at 152–53 (Maggio). It is commonly referred to as diplomatic asylum, because it may involve considerations similar to those in a claim for political asylum. 2 Tr. at 181 (McHugh–Martinez); 3 Tr. at 153 (Maggio).

27. Prior to Mr. Davies' death, the Davieses went for an interview in October 1989 in connection with their diplomatic asylum claim and everything seemed on track. 2 Tr. at 10 (Davies). At the time of Mr. Davies' death in November 1994, no action had been taken on their application, although they were permitted to renew their passports and work permits and work legally in this country. 2 Tr. at 12–13 (Davies).

28. In the summer of 1996, Respondent agreed to represent *pro bono* Mrs. Davies and her then 22 year old daughter, Owanate Davies, regarding their pending immigration case. BX 6C at 13; 6E at 21; 2 Tr. at 110 (Davies–Brony), 4 Tr. at 105 (Respondent). At that time, based on Mrs. Davies' pending Section 13 Petition, she and her daughter were legally in the United States. BX 2A; 2 Tr. 8 (Davies), 110 (Davis–Brony), 165, 192 (McHugh–Martinez); 3 Tr. at 182 (Maggio). They legally obtained work authorizations annually and were entitled to do so as long as their Section 13 claim had not been denied. 2 Tr. at 23 (Davies), 110 (Davis–Brony), 182 (McHugh–Martinez); 3 Tr. at 182 (Maggio).

29. Respondent advised the Davieses that he was unfamiliar with Section 13. 2 Tr. at 19 (Davies), 112 (Davis–Brony), 4 Tr. at 105 (Respondent). He advised the Davieses they should apply for political asylum before the INS Asylum Office, without comparing or explaining the relative merits of that option as opposed to solely continuing with their Section 13 application. 2 Tr. at 21 (Davies), 112–13 (Davies–Brony).

30. Respondent filed applications for political asylum for Malinda and Owanate Davies with the INS Asylum Office on February 25, 1997. BX 2D, 3A; 2 Tr. at 25 (Davies), 113 (Davies–Brony).

31. Respondent was obligated to inform Malinda and Owanate Davies of the risks associated with pursuing regular political asylum claims because, when political asylum claims are denied, applicants are automatically placed in deportation proceedings (3 Tr. at 182–83 (Maggio), 2 Tr. at 182–83 (McHugh–Martinez)), rather than continuing to pursue solely the diplomatic asylum claim, which, if it is denied, gives rise to the right to an administrative appeal, which usually takes years to pro-

cess (3 Tr. at 154, 184–85 (Maggio)), and which does not automatically lead to deportation proceedings. 3 Tr. at 183–84 (Maggio); 2 Tr. at 182, 187 (McHugh–Martinez).

32. For these reasons the filing of the political asylum applications was imprudent; the appropriate course of action would have been to await a decision on their pending Section 13 applications. 2 Tr. at 178, 182 (McHugh–Martinez); 3 Tr. at 154, 181, 185, 192 (Maggio).

33. Respondent did not understand these consequences. 4 Tr. at 110 (Respondent). Indeed, Respondent acknowledges that he made errors, particularly in regard to pursuing political asylum claims when Mrs. Davies was legally in this country pursuant to her diplomatic asylum petition. Respondent's Post–Hearing Br. at 5.

34. By letter dated December 9, 1997, the INS deemed Malinda Davies' political asylum application inadequate for approval. BX 2G; 2 Tr. at 30 (Davies). Mrs. Davies was placed in deportation proceedings and her application was referred to the Immigration Court. BX 2G–2I.

35. Mrs. Davies had an Immigration Court hearing scheduled for March 11, 1998. BX 2I; 2 Tr. at 33 (Davies). Respondent did not explain to Mrs. Davies the purpose of the hearing nor did he prepare her for what to expect that day. 2 Tr. at 34 (Davies).

36. On the day of the hearing, Mrs. Davies, because her car was unreliable, had made arrangements to ride with Respondent to the Immigration Court, but was ill and arrived late at the pre-arranged rendezvous point. 2 Tr. at 34–36 (Davies), 4 Tr. at 113–14 (Respondent).

37. When Respondent appeared in the Immigration Court without Malinda Davies, the Immigration Court ordered her deported *in absentia* for failing to appear.

BX 2J. Respondent did not explain the ramifications of the Immigration Court's decision to Mrs. Davies. 2 Tr. at 34 (Davies).

38. Respondent filed a Motion to Reopen to set aside the *in absentia* order against Mrs. Davies with the Immigration Court on April 10, 1998, citing "transportation problems" rather than Mrs. Davies' illness as the reason why she had failed to appear. BX 2K, 2L; 4 Tr. at 120–22 (Respondent); 2 Tr. at 40 (Davies), 3 Tr. at 188 (Maggio).

39. While an *in absentia* deportation order can be set aside when a failure to appear is due to illness (4 Tr. at 122 (Respondent), 3 Tr. at 189 (Maggio)), it seems to be fairly well established that "transportation problems" of the type cited by Respondent are not a legally sufficient basis to reopen a deportation hearing for a failure to appear. 2 Tr. at 196–97 (McHugh–Martinez), 3 Tr. at 189 (Maggio); *See In re: S–A–*, 21 I & N Dec. 1050 (BIA 1997).

40. Notwithstanding the foregoing, Respondent cited "transportation problems" as the sole basis in support of a Motion to Reopen filed on Malinda Davies' behalf despite the fact that she executed, and Respondent filed, an affidavit in which she explained she had not appeared because of illness. BX 2K; 2 Tr. at 39–40 (Davies), 3 Tr. at 188–189 (Maggio), 4 Tr. at 120–22 (Respondent).

41. On April 17, 1998, the Immigration Court denied Respondent's Motion to Reopen and refused to set aside Mrs. Davies' deportation order because of a "contradiction" between what Respondent represented in the pleading and Malinda Davies' affidavit regarding her failure to appear. BX 2L; 2 Tr. at 47 (Davies).

42. Respondent filed a notice of appeal from the denial of his Motion to Reopen. BX 2M. While he argued that illness was

the ultimate cause of Mrs. Davies' failure to appear (BX 2O), the Board of Immigration Appeals dismissed the appeal on February 11, 1999, finding that Respondent had not adequately documented Mrs. Davies' claim of illness. BX 2P.

43. Mrs. Davies unsuccessfully attempted to reach Respondent to find out about the status of her case and that of her daughter's on a number of occasions after he filed the appeal. BX 6C at 13–14; 2 Tr. at 53 (Davies), 2 Tr. at 124 (Davies–Brony).

44. Because she had not heard from Respondent for several months, Malinda Davies retained new immigration counsel to represent her and her daughter. BX 2Q; 2 Tr. at 58 (Davies). It was through successor counsel that she first learned the date that the BIA had dismissed her appeal and that she was subject to arrest and deportation. 2 Tr. at 163 (McHugh–Martinez).

45. Respondent had not notified Malinda Davies that the BIA had dismissed her appeal until approximately three weeks after it had been issued (BX 6C at 13; 2 Tr. at 50 (Davies)). He failed to explain the significance of the decision (i.e. that she was subject to arrest and deportation) (2 Tr. at 52 (Davies)) and that she had only 30 days to appeal the decision to federal court or 90 days to petition to reopen her case. 2 Tr. at 52 (Davies), 163–64, 169 (McHugh–Martinez). By the time Mrs. Davies had hired new counsel, more than 90 days had elapsed from the date of the BIA order dismissing her appeal. 2 Tr. at 163–64, 169 (McHugh–Martinez). It was Mrs. Davies' new counsel who informed her that she was "out of status," illegally present in this country, and that her pending Section 13 petition no longer helped her. 2 Tr. at 126–27 (Davies–Brony). Mrs. Davies was extremely upset because she had never been out of status before. 2 Tr. at 55–56 (Davies).

46. On May 19, 1999, Mrs. Davies' successor counsel filed a motion with the BIA charging that Respondent had rendered ineffective assistance of counsel and seeking a remand to the Immigration Court. BX 2R; 2 Tr. at 168–69 (McHugh–Martinez). Although the BIA denied the motion, Mrs. Davies' successor counsel, on a Petition for Review to the United States Court of Appeals for the Fourth Circuit, persuaded that Court that Mrs. Davies had met the procedural requirements to be able to pursue a Motion to Reopen before the Board based on a claim of ineffective assistance of counsel, and accordingly remanded to the Board to consider the merits of that claim. *Davies v. INS,* No. 00–1773, 10 Fed.Appx. 223 (4th Cir. June 5, 2001) (BX 2S). The case was reopened and remanded to the Immigration Judge by order dated February 7, 2002. BX 2T; 2 Tr. at 169 (McHugh–Martinez).

47. Malinda Davies eventually obtained her green card through her son, who had become a naturalized U.S. citizen and then sponsored her application. 2 Tr. at 172–173 (McHugh–Martinez).

### C. COUNT III: OWANATE DAVIES (BAR DOCKET NO. 112–02)

48. Findings of Fact Paragraphs 24 through 33 are incorporated herein.

49. By letter dated January 27, 1998, Owanate Davies' political asylum application was deemed inadequate by the INS. She was placed in deportation proceedings and her application was referred to the Immigration Court, which scheduled a hearing for October 7, 1998. BX 3B, 3C; 2 Tr. at 116–17 (Davies–Brony).

50. As the October 7 hearing approached, Owanate Davies had difficulty reaching Respondent and although she met with him the day before the scheduled

 

hearing, she was not prepared by him for the hearing. 2 Tr. at 118–20 (Davies–Brony). The October 7th hearing did not go forward for administrative reasons and was ultimately rescheduled for April 5, 1999. 2 Tr. at 120–21 (Davies–Brony).

51. In the middle of March, Owanate Davies telephoned Respondent's office to remind him of the upcoming hearing and to schedule a meeting to prepare for the hearing. He had not prepared her previously. 2 Tr. at 119, 124 (Davies–Brony). Respondent had not informed his client that this hearing was her asylum trial date. 2 Tr. at 124 (Davies–Brony). He had not marshaled witnesses, filed a witness list or submitted any documentary evidence in support of her asylum claim. 2 Tr. at 126 (Davies–Brony). Her calls to Respondent went unreturned (BX 6E at 21; 2 Tr. at 124 (Davies–Brony)) and she was not told that Respondent had filed on March 29, 1999 an "Emergency Motion to Continue" because he had been called out of the country on an emergency matter. BX 3G; 2 Tr. at 140–41, 150–51 (Davies–Brony), 173–74 (McHugh–Martinez).

52. On or about April 1, 1999, Owanate Davies met with another attorney, Ms. McHugh–Martinez, who would ultimately become her successor attorney. 2 Tr. at 157 (Davies–Brony), 161 (McHugh–Martinez). Lacking a file on Owanate Davies' case, she could not undertake to represent her at the upcoming hearing on two business days' notice. 2 Tr. at 127–28 (Davies–Brony). For the first time, Owanate Davies found out that April 5th was her trial date, that she would have to introduce evidence in support of her political asylum claim, that she would have to testify, and that Respondent should have submitted a witness list and other evidence 10 days before trial. 2 Tr. at 126–27, 131 (Davies–Brony), 161 (McHugh–Martinez). In an effort to help Owanate Davies, Ms.

McHugh–Martinez wrote a letter on her behalf requesting that the Immigration Judge continue the trial, promising to represent her if afforded the time to do so. 2 Tr. at 162–63 (McHugh–Martinez).

53. On April 5, 1999, Owanate Davies appeared alone in Immigration Court for her hearing on her application for political asylum. BX 6E at 21; 2 Tr. at 64–65, (Davies). Respondent failed to appear. He did not send someone in his stead to protect Owanate Davies' interests. BX 6E at 21; 2 Tr. at 65 (Davies), 132–33 (Davies–Brony). Owanate Davies was required to represent herself at trial. 2 Tr. at 133–34 (Davies–Brony), 174 (McHugh–Martinez). Respondent had not prepared her to testify, had not prepared any other witnesses to testify and had not submitted any documentary or other evidence in support of her asylum claim. 2 Tr. at 118–19, 126, 131, 156–57 (Davies–Brony), 161 (McHugh–Martinez).

54. By order dated April 5, 1999, the Immigration Court denied Owanate Davies' political asylum application. BX 3E; 2 Tr. at 142 (Davies–Brony). While it was somewhat unusual for the Immigration Judge to go forward without counsel in an asylum trial, a review of the tape and transcript of the proceedings by successor counsel indicated that the judge was angry because Respondent had previously requested expedited treatment and then later turned around and requested a continuance. 2 Tr. at 173–74 (McHugh–Martinez), 133–34, 141, 151–52 (Davies–Brony).

55. Ms. McHugh–Martinez is now handling Owanate Davies' immigration case. 2 Tr. at 151 (Davies–Brony), 165, 175 (McHugh–Martinez). Although she is married to an American citizen, Owanate Davies has not been able to obtain her green card. 2 Tr. at 151 (Davies–Brony), 175–77 (McHugh–Martinez). She has re-

ceived a "Bag and Baggage" letter requiring her to report to a detention center. 2 Tr. at 175–76 (McHugh–Martinez). The only reason she was not arrested was because INS did not have space to accommodate her. 2 Tr. at 176 (McHugh–Martinez). Ms. McHugh–Martinez had to obtain a stay of deportation while the instant disciplinary proceedings are pending to ensure Owanate Davies' presence before this Committee. 2 Tr. at 176 (McHugh–Martinez).

### D. COUNT IV: TOYIN ASEGIEME (BAR DOCKET NO. 146–00)

56. Toyin Asegieme, a Nigerian citizen, through a New York attorney, had previously filed a political asylum claim. BX 6G; 1 Tr. at 25, 27–30 (Asegieme).

57. Mrs. Asegieme moved to the Washington metropolitan area and was introduced to Respondent by a friend. 1 Tr. at 27. On December 8, 1995, Mrs. Asegieme signed a document authorizing Respondent to appear on her behalf and act as her representative, although the document is dated April 11, 1996. BX 4A; 1 Tr. at 29 (Asegieme). Ms. Asegieme was seeking an adjustment of status based on being a registered nurse, and in that regard Respondent sought a labor certification (an H–1B visa) (BX 4A) and a green card (an adjustment of immigration status). BX 4B; 1 Tr. at 27–30 (Asegieme); 1 Tr. at 113–16 (Karpinski).

58. In September 1997, Ms. Asegieme signed a retainer agreement with Respondent, whereby she agreed to pay $3500 in attorney fees for legal work in connection with "Labor Certification/Employment Sponsorship," with the understanding that she might be required to pay an additional fee to a sponsor. BX 4D; 1 Tr. at 32–33

(Asegieme). Respondent had informed her that it was necessary to pay the sponsor. 1 Tr. at 37 (Asegieme). Ultimately, Ms. Asegieme paid Respondent $1000 for Optimum Care Medical Center, LCC, the employer that was purportedly sponsoring her (1 Tr. at 35 (Asegieme); BX 4F), as well as additional funds for payment of attorneys fees and other costs. 1 Tr. at 36 (Asegieme); BX 4E.[7]

59. In connection with her application for an adjustment of status, Respondent, on behalf of Ms. Asegieme, filed an "Immigrant Petition for Alien Worker" (BX 4B), which was approved by the INS on September 9, 1997. (BX 4G).

60. Utilizing the approved Petition for Alien Worker certification, in October 1997, Respondent, on behalf of Ms. Asegieme, filed an application for adjustment of status to permanent residence. (BX 4C).

61. In October 1998, Ms. Asegieme received a notice to appear for an interview at INS offices in Baltimore on January 6, 1999, in connection with her adjustment of status petition. BX 4H. Although Respondent confirmed he had received the notice of interview in a telephone conversation with Ms. Asegieme, and that they should meet at the immigration office in Baltimore, Respondent did not meet with her in advance of the interview, prepare her for the interview or tell her what to expect at the interview. 1 Tr. at 42–43 (Asegieme).

62. On January 6th, Ms. Asegieme appeared for the interview, but Respondent did not. He never informed her that he would not appear or that he would not send someone else in his stead or that the interview would not take place that day. 1

---

**7.** Altogether, Ms Asegieme paid Respondent $5,855 in attorney's fees, sponsor fees, and

other fees and costs. *See* BX 4E, 4F.

Tr. at 44–45 (Asegieme). As it turned out, the interview did not go forward because Ms. Asegieme's file was missing. 1 Tr. at 45 (Asegieme). In a subsequent phone conversation with Ms. Asegieme, Respondent stated that he had known the interview was not going to go forward. 1 Tr. at 46 (Asegieme), 4 Tr. at 162–64 (Respondent).

63. In January 1999, Ms. Asegieme received a "Notice of Hearing in Removal Proceedings" setting a hearing on March 24, 1999, in connection with the political asylum claim that had previously been filed on her behalf. BX 4J. Although Ms. Asegieme did not specifically retain Respondent to handle her political asylum claim (1 Tr. at 30 (Asegieme)), she had asked him to withdraw that petition. 1 Tr. at 63 (Asegieme). Respondent had assured Ms. Asegieme that he would write a letter informing the immigration authorities that she was pursuing a different form of relief and would withdraw the asylum petition. 1 Tr. at 64–65 (Asegieme). He never wrote the letter as promised. 1 Tr. at 63–64, 90 (Asegieme). Withdrawing an asylum petition to protect a client's interest is a fairly simple matter to resolve; it merely required that Respondent bring to the attention of the immigration authorities that Ms. Asegieme was pursuing a different form of relief; an adjustment of status application. 1 Tr. at 101 (Karpinski). Respondent should have notified the INS because it avoids the problem of having an essentially moot asylum petition being denied and triggering an automatic deportation proceeding, which would clearly interfere with her desire to adjust her status, the matter for which Respondent was specifically retained. 3 Tr. at 206–07 (Maggio). The ultimate denial of the asylum request caused Ms. Asegieme to end up in deportation proceedings. 3 Tr. at 206–07 (Maggio), 1 Tr. at 99–102 (Karpinski).

64. In connection with the removal hearing, Ms. Asegieme retained another attorney, Ms. Irena Karpinski, because she had been unable to reach Respondent when he did not return her calls and because she had had previous trouble with Respondent in connection with showing up for a scheduled interview. 1 Tr. at 65 (Asegieme), 98–99 (Karpinski). When Ms. Karpinski learned that Ms. Asegieme had an adjustment of status petition pending she contacted the INS trial attorney's office and they agreed that the removal proceedings should be terminated (1 Tr. at 100–02 (Karpinski)), the step Respondent never took. Ms. Asegieme decided not to have Ms. Karpinski take over her pending adjustment of status petition since she had already paid Respondent to do that work. 1 Tr. at 67 (Asegieme), 103 (Karpinski).

65. In March, 1999, Ms. Asegieme received another notice for an interview in connection with her Petition for Adjustment scheduled for June 23, 1999, in Baltimore. BX 4I. Ms. Asegieme testified that once again Respondent took no steps to prepare her for the interview (1 Tr. at 59–60 (Asegieme)) other than assuring her that she should not be concerned about presenting INS a letter on Optimum Care Medical Center, LLC letterhead (BX 4L) that stated she was currently employed by Optimum—her erstwhile sponsor—when in fact she was not currently so employed. 1 Tr. at 52 –59 (Asegieme). That letter bore a date of January 6, 1999, the date of the first interview, and had been given to Ms. Asegieme by Respondent prior to the date of the first interview. 1 Tr. at 54–55 (Asegieme).

66. When Ms. Asegieme called Respondent's office the day before the rescheduled interview to make sure he would be at the interview, she was informed that Re-

spondent was in Africa. 1 Tr. at 61 (Asegieme). Mr. Ukwu's secretary confirmed that Ms. Asegieme had an interview scheduled for the next day, unsuccessfully asked around the office to see if another attorney could appear at the interview with her, but ultimately informed Ms. Asegieme no other attorney was available to attend the interview with her. 1 Tr. at 61–61 (Asegieme).

67. Without representation from Mr. Ukwu or another attorney with whom he was associated, Ms. Asegieme late in the day before her interview, turned again to Ms. Karpinski and retained her to represent her at the June 23rd interview. 1 Tr. 68–69 (Asegieme), 103–04 (Karpinski). She paid Ms. Karpinski a retainer of $1700. 1 Tr. at 68, 70 (Asegieme).

68. Ms. Karpinski attended the June 23rd interview with Ms. Asegieme although she had no opportunity to prepare or otherwise review records. 1 Tr. at 103–04 (Karpinski). The Optimum letter that Respondent had given Ms Asegieme was ultimately submitted by Ms. Asegieme to INS. 1 Tr. at 57 (Asegieme), 107–08 (Karpinski).

69. Ms. Asegieme expected Respondent to appear with her at the interview based on the retainer agreement she signed and his oral statements. He never informed her that he would be in Africa on the day of the interview, and he did not make arrangements to send someone in his place for the interview. 1 Tr. at 69–70, 80–82 (Asegieme).

70. The issue of the truthfulness of the letter and whether Ms Asegieme was actually employed by Optimum became an issue with INS as reflected by receipt of an intent to deny, but ultimately Ms. Asegieme, through Ms. Karpinski, prevailed in obtaining her green card because the alien is not required to work for the sponsoring employer before the adjustment of status. 1 Tr. at 109–10, 116–17 (Karpinski).

### E. COUNT V: ESTHER TEMBI (BAR DOCKET No. 193–02)

71. Esther Tembi is a native of Cameroon. 3 Tr. at 9 (Tembi). In 1998, Ms. Tembi retained Respondent as successor counsel to represent her in a previously filed asylum claim based on her experience as a member of an opposition group in Cameroon and agreed to his fee of $2000. BX 5A, 5B at 8; 3 Tr. at 9, 12–13, 25, 29 (Tembi).

72. In connection with Ms. Tembi's political asylum claim, Respondent failed to prepare adequately for a hearing at which he was to present evidence on Ms Tembi's behalf. BX 5B; 3 Tr. at 14, 16, 18–19 (Tembi). Respondent did not sit down with Ms. Tembi to understand the facts of her story in order to gather the necessary corroborative evidence or to prepare her in any way for the hearing. 3 Tr. at 15–20 (Tembi), 3 Tr. at 155–56, 215–16 (Maggio).

73. Respondent also failed to take care of procedural details before Ms. Tembi's trial by the required deadline: he failed to file a complete exhibit list or his documentary exhibits. BX 5B at 13; 3 Tr. at 23 (Tembi). Ms. Tembi's trial was continued on at least one occasion as a result. BX 5B at 9, 11, 19, 20; 3 Tr. at 14, 23 (Tembi).

74. During the representation, Respondent failed to communicate adequately with Ms. Tembi, including on a number of occasions when she attempted to contact him regarding the status of her case or when she had questions. 3 Tr. at 16–17, 23–24 (Tembi).

75. Although Respondent had agreed to accept $100 per month from Ms. Tembi to pay off the balance of his retainer (BX 5A at 4; 3 Tr. at 25 (Tembi)), by letter dated September 25, 1998, he informed her for the first time that he would not repre-

sent her at her October 15th trial unless she paid the $1,200 outstanding balance she owed. 3 Tr. at 24 (Tembi), 102–03 (Yunmbam). Ms. Tembi arranged to meet with Respondent to discuss his fees and Respondent reiterated that he would not represent her without payment. 3 Tr. at 25–26 (Tembi).

76. Between Ms. Tembi's wages, and funds solicited by her friend Doris Yunmbam from members of the Cameroonian immigrant community, she was able to raise $1,200. 3 Tr. at 28, 87 (Tembi), 103 (Yunmbam).

77. On October 15, 1998, Ms. Yunmbam drove Ms. Tembi to the Immigration Court for her asylum trial. 3 Tr. at 104 (Yunmbam). She specifically observed that Ms Tembi gave Respondent the $1,200 and that he counted it. 3 Tr. at 104–05, 110–11 (Yunmbam). In fact, Respondent represented Ms. Tembi at the October 15th trial. 3 Tr. at 29–30.

78. Respondent had not met with Ms. Tembi in advance to prepare her to give testimony at her asylum trial. 3 Tr. at 23–23 (Tembi). As a result, she did not know what to expect and was nervous and afraid. 3 Tr. at 16–18 (Tembi). In the view of Ms. Tembi and Ms. Yunmbam the asylum trial did not go well. 3 Tr. at 31 (Tembi), 107 (Yunmbam).

79. Two weeks later, on October 30, 1998, the Immigration Judge denied Ms. Tembi's asylum application in an oral decision. BX 5C. The Immigration Judge informed Ms. Tembi, in Respondent's presence, that she had 30 days to file an appeal and that she would be permitted to leave the country voluntarily if she posted a $500 bond by November 5, 1998, and presented her travel documents to INS by November 30, 1998. BX 5C; BX 5D; 3 Tr. at 32–33 (Tembi).

80. Immediately after the asylum hearing, Respondent assured Ms. Tembi that he would file an appeal on her behalf. 3 Tr. at 31–34 (Tembi).

81. Although she raised the issue of the bond with Respondent immediately after the hearing, he encouraged her to go home and rest and assured her that they had time to address the matter. 3 Tr. at 35 (Tembi). Thereafter, on a number of occasions, Ms. Tembi attempted to telephone Respondent to arrange to pay the bond, but he failed to return her calls. 3 Tr. at 35–36 (Tembi). It was not until November 4th, one day before the bond was due, that she reached Respondent. 3 Tr. at 36 (Tembi).

82. Pursuant to Respondent's instruction, Ms. Tembi came to Respondent's office on November 5th and gave him a $500 money order for the bond. 3 Tr. at 37–38 (Tembi). He assured her that he would arrange to have it delivered. 3 Tr. at 40 (Tembi).

83. The bond was not timely filed with INS. BX 5G. Respondent, in a November 20th letter to INS, stated that the bond had been returned to his office and that Ms. Tembi had incorrectly sent the money to the Immigration Court rather than INS. BX 5E. The INS specifically argued that the failure to post the bond timely converted the voluntary order of departure into an order of removal. BX 5G. By failing to file the bond in a timely manner, Respondent was responsible for Ms. Tembi being ordered deported rather than being allowed voluntary departure. 3 Tr. at 218, 223 (Maggio); 40–42 (Tembi). Someone who is ordered deported rather than being granted voluntary departure becomes ineligible for the relief they seek and cannot return to the United States legally. 3 Tr. at 211–12 (Maggio). Respondent never informed his client of the consequences of his having failed to file the bond in a

timely manner. 3 Tr. at 34–35, 41–41 (Tembi).

84. On November 30, 1998, Respondent filed a notice of appeal in Ms. Tembi's asylum case. BX 5F. In the notice, he requested oral argument and indicated that he would file a further written statement in support of the appeal. BX 5F at 29. The notice clearly indicated that failure to follow through with the stated intention of filing a timely further written brief may lead to the summary dismissal of the appeal. BX 5F at 29. By notice dated March 8, 1999, the Board of Immigration Appeals (BIA) informed Respondent his brief was due on or before April 7, 1999. BX 5H.

85. Respondent failed to file the Brief. BX 5K at 41, 61; 3 Tr. at 49–50 (Tembi). Two months after the brief was due, Respondent, on June 8, 1999, filed a motion with the BIA to withdraw as counsel. BX 5I. Attached to the motion were copies of two letters he claimed were previously sent to Ms. Tembi—the first, dated March 26, 1999, which states that his firm was prepared to file the appeal brief upon payment of the balance due for the initial asylum case, as well as a substantial payment towards the appeal (BX 5I at 37) and the second, dated June 8, 1999, advising Ms. Tembi that the firm was withdrawing their representation of her. BX 5I at 38.

86. Ms. Tembi had, however, already paid Respondent in full for her asylum case on the day of her merits hearing in October 1998. 3 Tr. at 28, 94–95 (Tembi), 104–05, 108, 110–11 (Yunmbam). Ms. Tembi testified that she did not receive Respondent's November 4, 1998 letter asking that she pay off his initial fee and sign a new fee agreement. RX 1;[8] 3 Tr. at 32,

88–89 (Tembi). Moreover, since the original retainer agreement that Ms. Tembi signed did not make clear that the $2,000 "Total Agreed Fee" was only for services through an asylum hearing, and did not include an appeal (BX 5A), Ms. Tembi had no basis to believe an additional fee was due. Ms. Tembi testified that she had never seen the March 26th or June 8th letter until she was shown them by Bar Counsel. 3 Tr. at 54, 56 (Tembi). Respondent never notified Ms. Tembi that he was withdrawing from her appeal. 3 Tr. at 58 (Tembi). She found out when INS notified her by letter on June 30, 1999. BX 5J; 3 Tr. at 57, 59 (Tembi). Ms. Tembi found out her appeal was denied after the BIA mailed her a copy of its final decision rendered on March 11, 2002. BX 5K; 3 Tr. at 60, 64 (Tembi), 11, 119(Li). In dismissing the appeal the BIA specifically relied on the fact that although Respondent had indicated a written brief would be filed, no such brief was ever filed. BX 5K.

87. In April 2002, Ms. Tembi retained successor counsel to protect her interests in remaining in the United States. 3 Tr. at 64–65 (Tembi), 3 Tr. at 114(Li). Successor counsel's attempt to have the Board of Immigration Appeals reconsider the dismissal of Ms. Tembi's appeal was opposed by the INS on the basis that her failure to meet the conditions for voluntary departure originally set by the November 5, 1998, Order, rendered the March 11, 2002, decision a final order of removal that statutorily barred Ms. Tembi from seeking an adjustment of status for 10 years—until March 12, 2012. BX 5L. A still subsequent attempt to get the BIA to exercise its discretion to reopen also failed. 3 Tr. at 126–27(Li).

8. The November 8, 1998 letter was submitted by Respondent as an exhibit before the Hearing Committee; it was not, however, submitted during the course of Bar Counsel's investigation. BX 6J.

88. Ms. Tembi is still attempting to avoid the deportation order that was entered while she was being represented by Respondent. 3 Tr. at 69 (Tembi), 212–13 (Maggio). Indeed, she had received an order of deportation and was required to appear before a deportation officer in Baltimore around the time she was scheduled to appear before the Hearing Committee, which, with the aid of a letter from Bar Counsel and the assistance of Bar Counsel's expert witness, Mr. Maggio, was rescheduled so she would remain available to testify during these proceedings. 3 Tr. at 213 (Maggio).

FINDINGS REQUESTED BY BAR COUNSEL

Bar Counsel asks that the Board find the following as uncontested but not expressly found by the Hearing Committee:

89. Immigrants often come from countries with corrupt governments in which a culture of lying both by and to state authorities is the norm. 3 Tr. at 157–58 (Maggio). It is not uncommon for immigration clients to believe that the United States Government operates in similar ways. *Id.* An attorney often must break down a culture of lying to the government and explain to his clients that it is not permissible to submit false evidence. *Id.*

Brief in Support of Bar Counsel's Exception to the Report and Recommendation of the Ad Hoc Hearing Committee ("BC Brief"), at 26.

We decline to adopt this finding. Although it may be uncontested, it also is nothing more than a general statement of the attitude of some unspecified persons who come from countries "where the government is a collection of kleptomaniacs." 3 Tr. 158 (Maggio). There is no evidence that any of the African countries from which Respondent's clients came fit this description or that any of Respondent's

clients believe that they do. Accordingly, the requested finding is of limited, if any, materiality, and we agree with the Hearing Committee's refusal to make the above finding, even though requested by Bar Counsel. *See* Bar Counsel's Proposed Findings of Fact, Conclusions of Law, and Recommendation as to Sanction, filed on August 9, 2004, at 37.

Bar Counsel also requests that the Board find the following as established by clear and convincing evidence, even though not found by the Hearing Committee:

90. When Owanate Davies had a hearing scheduled for October 7, 1998 and telephoned Respondent's office to ask him to prepare her, Respondent advised her that he had forgotten that they were to appear in court on October 7. BX 6E at 21; 2 Tr. at 120 (Davies–Brony). He then advised Owanate to see a physician to get a "Notice of Illness" on her part for him to present in Immigration Court in support of a contemplated request for a continuance, even though she was not ill. 2 Tr. at 120 (Davies–Brony).

91. Before Respondent could submit a false claim of illness, the Immigration Court rescheduled Owanate Davies's case to April 5, 1999, for administrative reasons. 2 Tr. at 120–21 (Davies–Brony).

Respondent, however, categorically denied that he "suggest[ed] to [Owanate Davies] to go get any doctor's report." 4 Tr. 132. He testified that he "do[es] not even recall that being in [their] conversation." *Id.*

We therefore decline to adopt this requested finding since our doing so would require that we make an assessment of credibility that the Hearing Committee appears to have made in rejecting the finding.

## II. Analysis
### Rules 1.1(a), 1.1(b), 1.3(a) and 1.4(a)— "Adequate Representation" Rules

Four provisions in the Rules of Professional Conduct impose affirmative duties that serve to shape the professional calling of lawyers. The first three rules require that a lawyer represent his clients with competence, that is, with "legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation" (Rule 1.1(a)), with "skill and care" (Rule 1.1(b)) and with zeal and diligence (Rule 1.3(a)). The fourth (Rule 1.4(a)) enjoins the lawyer to "keep [his] client reasonably informed about the status of a matter and promptly comply with reasonable requests for information."

The Hearing Committee found that Respondent violated all four of these rules in connection with his representation of each of the five former clients of Respondent in these matters. Respondent filed no exception to those findings.

The four rules are not mere aspirations. They set standards that the legal profession is obliged to meet because lawyers often are entrusted with responsibility for some of the most important matters in their clients' lives. The five clients whom Respondent undertook to represent brought legal problems of great personal importance. The Hearing Committee's findings, each supported by substantial evidence, of Respondent's inexcusable lack of legal knowledge leading to faulty legal advice and prejudicial litigation steps, his repeated failures to inform them about hearings and of the consequences of rulings made in their cases, his consistent failure to prepare his clients for hearings and interviews, his neglect of important filings and his appearances at important hearings without preparation amply estab-

lish Respondent's multiple violations of Rules 1.1(a), 1.1(b), 1.3(a) and 1.4(a).

### Rule 1.3(b)—Intentional Neglect of Client Matter

Bar Counsel charged Respondent with violations of Rule 1.3(b) with respect to all five of his former clients. The rule forbids two kinds of intentional conduct—intentionally "fail[ing] to seek the lawful objectives of a client through reasonably available means" (Rule 1.3(b)(1)) and intentionally "prejudic[ing] or damag[ing] a client during the course of the professional relationship". Rule 1.3(b)(2).

The Hearing Committee found a violation of both subparagraphs of Rule 1.3 in the *Tembi* case (Bar Docket No. 193–02), but found a lack of clear and convincing evidence of a violation of the rule in the other four cases. Under the Board's standard of review, "we give deference to the Committee's 'subsidiary findings of basic facts,'" but "the Board owes no deference to the Committee's determination of 'ultimate facts,' such as whether the facts establish a violation of a Rule and other conclusions of law". *In re Frank,* Bar Docket No. 212–98 (June 13, 2005) at 13 (quoting *In re Berryman,* 764 A.2d 760, 766 (D.C.2000)). Moreover, "[t]he determination as to whether Respondent's conduct is negligent, reckless or intentional is a question of ultimate fact." *Id.*

The Board's report in *In re Lewis,* Bar Docket No. 105–94 (BPR July 30, 1996), appended to *In re Lewis,* 689 A.2d 561 (D.C.1997) (per curiam), provides guidance on distinguishing intention from neglect in Rule 1.3(b) cases. The Board there observed that "[n]eglect ripens into an intentional violation when the lawyer is aware of his neglect of the client matter, or the neglect is so pervasive that the lawyer must be aware of it." *Lewis,* 689 A.2d at 564. "Knowing abandonment of a client,"

the Board went on to explain, "is the classic case of a Rule 1.3(b)(1) violation." *Id.*; *see also In re Owusu,* Bar Docket No. 109–02 (BPR July 30, 2004) (pending appeal). We thus examine the Hearing Committee's "subsidiary findings of basic facts" in the *Tembi* case to determine the issues of "ultimate fact," *Berryman,* 764 A.2d at 766—whether Respondent was aware of the neglect found by the Committee, whether the neglect was "so pervasive" that Respondent must have been aware of it, and whether the findings establish a knowing abandonment of his clients or any of them. *Lewis,* 689 A.2d at 564.

A theme running through the five client matters has Respondent failing in every case to prepare the client for an Immigration Court hearing or an INS interview, even failing in some cases to notify the client of a hearing or interview, failing to advise the client what the hearing or interview would be about, failing to return calls from clients who want to get prepared for hearings and interviews and, in some cases, failing even to appear at hearings to represent the client. The Hearing Committee, in four of the five cases, attributed those recurrent failures to Respondent's "slipshod" manner and his failure to devote sufficient "time and attention to representing these five clients" (HC Report at 41), but concluded in each case that the evidence was not sufficient to establish intentional conduct on Respondent's part.

Insofar as relevant to the Rule 1.3(b) charges, the findings establish that Respondent—

• failed in the *Madagu* case (Bar Docket No. 454–99) to give his client advance notice of an Immigration Court hearing on June 23, 1999, failed to prepare him for the June 1999 hearing, failed to appear at a November 1997 interview, failed to file documentation necessary to support his client's medical reasons for rescheduling a hearing set for May 19, 1999, and failed to appear at a hearing on June 23, 1999 (Findings 5–6, 12–14, 19);

• failed in the *Malinda Davies* case (Bar Docket No. 189–99) to explain to his client the serious adverse consequences of filing a political asylum claim as he advised, when she had pending an application for "diplomatic asylum" as the widow of a former Nigerian diplomat, failed to explain to his client the purpose of an Immigration Court hearing on March 11, 1998 or to "prepare her for what to expect that day," and failed to return his client's repeated telephone calls to "find out about the status of her case" (Findings 25–26, 28–33, 35, 43);

• failed in the *Owanate Davies* case (Bar Docket No. 189–99) to prepare his client or to appear for a hearing before the Immigration Court on April 5, 1999, for which he also failed to prepare his client, failed to file a witness list and failed to submit any documentary evidence (Finding 50–51);

• failed in the *Asegieme* case (Bar Docket No. 112–02) to withdraw a political asylum claim that previously had been filed by another lawyer, after assuring his client that he would do so, failed to prepare his client for an INS interview scheduled for June 23, 1999, and failed to appear for INS interviews on January 6, 1999, and June 23, 1999 (Findings 61–66); and

• failed in the *Tembi* case (Bar Docket No. 193–02) to meet with his client in advance to prepare her to give testimony and gather "the necessary corroborative evidence" for her Immigration Court hearing on October 15, 1998, and failed to file a brief on an appeal from an adverse ruling on his client's asylum claim (Findings 72–74, 78, 84–85).

Respondent failed to appear at a scheduled Immigration Court hearing or INS interview in five instances, once in November 1997, and four times in 1999—January 6 (Asegieme), April 5 (Owanate Davies) and June 23 (Madagu and Asegieme). Moreover, in each instance, no other lawyer appeared. He testified to the reasons for his absence in each case.

The November 18, 1997, INS interview in the *Madagu* case was the client's first interview with respect to his political asylum claim (which Respondent believed was weak). 4 Tr. 86. Madagu had married an American citizen on October 31, 1997, and Respondent thought he could get an "automatic" postponement on his first asylum interview, which would give him time to file an application for adjustment of status based upon the marriage. 4 Tr. 194–95. It turned out that Respondent was wrong. 4 Tr. 195. Under a "new rule [that] just took effect," INS referred cases in which an asylum claimant failed to appear with counsel at his first interview. 4 Tr. 194–95; *see also id.* at 88–89.

The January 6, 1999, INS interview in the *Asegieme* case "did not go forward," and Respondent testified that he had learned about the cancellation the day before. Finding 62; 4 Tr. 162–65. His client nevertheless appeared. 1 Tr. 43–44. There is a conflict in testimony, which the Committee's findings do not resolve, concerning whether Respondent advised his client of the cancellation before she went to the INS for the interview. As for the April 5 hearing in the *Owanate Davies* case, Respondent testified that he was out of the country, but that he "believed there was a communication from her mother that they had another attorney." 4 Tr. 239; *see also* 4 Tr. 228–40. Given this testimony, we decline to find that Respondent intentionally abandoned his clients by failing to attend the January 5 INS interview or the April 5 Immigration Court hearing.

Finally, regarding the June 23 hearing in the *Asegieme* case and the interview scheduled for the same day in the *Madagu* case, Respondent testified that he was in Nigeria at the time and "could not make it back to the United States" because he was admitted by a hospital in Nigeria with a diagnosis of "acute malaria." 4 Tr. 80–81. He further testified that he called his office and told his office manager to "arrange for someone to accompany" his clients. 4 Tr. 80–81, 94–95. The Hearing Committee appears to have accepted Respondent's explanations, at least to the extent that the Committee concluded that the evidence did not clearly and convincingly establish that Respondent had intentionally abandoned his clients when he failed to appear.

With regard to the other failures listed above, Respondent's conduct appears to have been consistently negligent, as the Hearing Committee found. But the question remains whether those failures are "so pervasive that [Respondent] must be aware of [his neglect]." *Lewis,* 689 A.2d at 564. None of the failures, taken by itself, was necessarily an intentional failure on the part of Respondent to seek the lawful objectives of his clients. Moreover, the aspects of Respondent's representations that can be said to pervade those cases are his failure to prepare his clients for the hearings and interviews they faced and his failure to return their telephone calls. Neither failing is so prevalent in any one of the representations that he must have been aware of it. Neither thus can be deemed to amount to an intentional failure to seek the client's lawful objectives or an intentional prejudicing of the client, the conduct that must be present for a violation of Rule 1.3(b).

Even though we deem "[t]he determination as to whether Respondent's conduct is . . . intentional is a question of ultimate fact" (*In re Frank,* Bar Docket No. 212–98 at 13) and thus for the Board to determine, our finding, like the finding of a hearing committee, must be based upon clear and convincing evidence. Board Rules 11.5 and 13.7. Our review of the evidence in these matters does not lead us to conclude that that standard of proof has been satisfied with respect to Respondent's conduct in the *Madagu* case, the two *Davies* cases or the *Asegieme* case.

Respondent's failure in the *Tembi* case to file the brief on appeal, however, stands on a different footing. The Hearing Committee did find a violation of Rule 1.3(b)(1) and 1.3(b)(2) in that case. The Hearing Committee's findings of the subsidiary facts supporting that finding are supported by "substantial evidence in the record as a whole" and the clear and convincing evidence establishes that Respondent intentionally failed to seek his client's lawful objectives and in so doing prejudiced her. Board Rule 13.7.

The Immigration Judge, when he announced that he denied the political asylum application that Respondent was pursuing with Ms. Tembi, "informed Ms. Tembi in Respondent's presence that she had 30 days to file an appeal to the [BIA] and that she would be permitted to leave the country voluntarily if she posted a $500 bond by November 5, 1998. . . ." Finding 79. As Respondent had instructed, Ms. Tembi "came to Respondent's office on November 5th and gave him a $500 money order for the bond." Finding 82. Although Respondent "assured her that he would arrange to have it delivered," "[t]he bond was not timely filed." Findings 82–83.

Respondent filed a timely notice of appeal, requesting oral argument and "indicat[ing] that he would file a further written statement in support of the appeal." Finding 84. The BIA notified Respondent on March 8, 1999, that the filing deadline for his brief in Ms. Tembi's case was April 7, 1999. Finding 84. Respondent, however, did not file any brief. Finding 85.

Two months after the briefing deadline, on June 9, 1999, Respondent filed a motion with the BIA to withdraw from the *Tembi* case. BX 5I. Attached to his motion was a document that purported to be a letter dated March 26, 1999, which Respondent testified was sent to Ms. Tembi, and which read as follows:

Dear Ms. Tembi:

Please be advised that our office has until April 7, 1999 to submit an [sic] brief to the Appeals Processing Unit on behalf of your case. While we are prepared to file the brief, we will not do so until you pay the balance of your initial case and make a substantial payment on your appeal. If you do not make a payment, we will have to withdraw from your case. Unfortunately, this firm is not prepared to take your case *pro bono.*

BX 5I at 37.

The Hearing Committee found, however, that Ms. Tembi, in fact, had paid the "outstanding balance she owed [on her case]." Finding 75. That finding is specified in Findings 76 and 77 as follows:

76. Between Ms. Tembi's wages, and funds solicited by her friend Doris Yunmbam from members of the Cameroonian immigrant community, [Ms. Tembi] was able to raise $1,200.

77. On October 15, 1998, Ms. Yunmbam drove Ms. Tembi to the Immigration Court for her asylum trial. She specifically observed that Ms. Tembi gave Re-

spondent the $1,200 and that he counted it.

(Record citations omitted).

Respondent vehemently denied that he ever received those funds, either on the day of Ms. Tembi's asylum hearing or any other time. 4 Tr. 134–36, 138. In fact, he testified that "[i]t was inconceivable that [Ms. Tembi] would have given me $1,200 cash on the day of the hearing and I would not remember that she did." 4 Tr. 135–36. "That was so much money for me to have received from her," he continued, "that I would have clearly remembered that she would have given me the money." 4 Tr. 136.

The Hearing Committee findings that Respondent did receive the money and that he was observed not only receiving it, but counting it as well, necessarily means that the letter he attached to his motion to withdraw is false. Moreover, the Hearing Committee's further finding that "Respondent never notified Ms. Tembi that he was withdrawing from her appeal" (Finding 86) confirms Ms. Tembi's testimony that she did not received either of the letters attached to Respondent's motion to withdraw and did not even receive the motion itself.

Those findings on the subsidiary facts compel the conclusion that Respondent intentionally abandoned Ms. Tembi, conduct that the Board has described as "the classic case of a Rule 1.3(b)(1) violation." *In re Owusu,* Bar Docket No. 109–02 (BPR July 30, 2004) (pending appeal).

### RULE 1.3(c)—THE OBLIGATION OF REASONABLE PROMPTNESS

Rule 1.3(c) obliges lawyers to "act with reasonable promptness in representing a client." The Hearing Committee did not find any violation of that rule proven by clear and convincing evidence. In discussing the *Malinda Davies* case, the Commit-

tee wrote that "[a]lthough we have concluded that Respondent's representation of Mrs. Davies fell short in a number of respects ... we cannot conclude that he generally failed to act promptly...." HC Report at 34. We do not agree.

The Hearing Committee found that the BIA dismissed the appeal in Mrs. Davies case "on February 11, 1999, finding that Respondent had not adequately documented Mrs. Davies' claim of illness." Finding 42. Respondent, however, allowed "approximately three weeks" to elapse before he notified Mrs. Davies that the BIA appeal had been dismissed, and even then did not "explain the significance of the decision (*i.e.,* that she was subject to arrest and deportation) and that ... she had only 30 days to appeal the decision to federal court...." Finding 45. By the time Respondent advised his client that the BIA had dismissed her appeal, only about nine days remained during which she could appeal to a federal court, a fact that Respondent did not tell her. *Id.* Those facts constitute a violation of Rule 1.3(c)'s reasonable promptness obligation.

### RULE 1.4(b)—EXPLAINING MATTERS TO THE CLIENT

Explaining legal matters to their clients is an essential part of the work of lawyers. Especially in an immigration law practice like Respondent's, with its complex set of rules and procedures and clients who often do not have great experience with the legal culture of the United States and are not proficient in speaking and reading the English language, the lawyer's assistance is vital to his clients' ability to understand fully the options available to them and the consequences of each option. The obligation, imposed by Rule 1.4(b), that the lawyer "explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the

representation" has special importance in immigration law cases.

Respondent was charged with failing to fulfill his Rule 1.4(b) obligation in only one of the cases under review, the *Tembi* case. The Hearing Committee found that the evidence established the violation charged. We have concluded that that finding is supported by substantial evidence in the record as a whole and therefore accept the Committee's finding.

### RULE 1.5(B)—WRITTEN STATEMENT OF FEE BASIS OR RATE

Rule 1.5(b) requires that, "[w]hen the lawyer has not regularly represented the client, the basis or rate of the fee shall be communicated to the client, in writing, before or within a reasonable time after commencing the representation." Bar Counsel contends that that provision was violated because Respondent failed to provide Ms. Tembi "a writing setting forth the basis or rate of his fee." BC Brief at 45.

The Hearing Committee writes, however, that Ms. Tembi testified that Respondent "never asked her for additional fees for handling the appeal." HC Report at 39. Presumably the Hearing Committee did not find a violation of Rule 1.5(b) because the record does not support the proposition that Respondent asked Ms. Tembi for a fee for her appeal. We accept the Hearing Committee's conclusion on this point.

### RULE 3.3—CANDOR TOWARD THE TRIBUNAL

Rule 3.3 states one of the lawyer's fundamental obligations—to speak truthfully to the tribunal. In the first provision of the rule, subparagraph (a)(1), that obligation is stated in a simple, straightfor-

ward way. "A lawyer shall not knowingly ... [m]ake a false statement of material fact or law to a tribunal." As we wrote in a recent Board report, "a violation of Rule 3.3(a) is an extremely serious ethical violation." *In re Parshall,* Bar Docket No. 430–01 at 34 (BPR Feb. 18, 2005), *aff'd,* No. 02–BG–430, 878 A.2d 1253 (D.C. July 21, 2005) (per curiam).

The Hearing Committee found that Respondent violated Rule 3.3(a)(1) with "misrepresentations to the INS and the Board of Immigration Appeals." HC Report at 39. The Committee goes on to describe the following misrepresentation to the INS:

> [Respondent] represented to the INS that Ms. Tembi had mistakenly mailed the bond required to stay deportation to the Immigration Court rather than INS, when in fact she credibly testified that she had delivered the bond to his office and he had assured her that it would be timely filed.[9]

*Id.*

The Hearing Committee found that Respondent made misrepresentations to the BIA when he attached to his motion to withdraw copies of letters he had purportedly sent to Ms. Tembi, one asking for the balance owed on his fees and the other advising her that his firm was withdrawing from representing her. The Hearing Committee credited Ms. Tembi's testimony that she had paid Respondent's full outstanding balance, that he never asked her for additional fees for handling her appeal, and that she never received the letters in question. *See supra,* pp. 1133–34.

The Hearing Committee does not explicitly state that Respondent's misrepresentations were "knowing" and "false." Both

---

**9.** The paragraphs in the Hearing Committee's findings of fact that support the quoted state- ment in the text are Findings 82 and 83.

findings, however, are implicit in its finding that Respondent violated Rule 3.3(a)(1). Accordingly, we accept the Hearing Committee's finding that Respondent violated Rule 3.3(a)(1).[10]

### RULE 8.4(c)—"DISHONESTY, FRAUD, DECEIT AND MISREPRESENTATION"

Bar Counsel contends that the evidence establishes that Respondent was engaged in "conduct involving dishonesty, fraud, deceit and misrepresentation," which Rule 8.4(c) forbids, in three of the five disciplinary cases under review. The Hearing Committee found a Rule 8.4(c) violation in the *Tembi* case, but concluded that Bar Counsel had not proven the Rule 8.4(c) violations charged in the *Owanate, Davies* or *Asegieme* cases. Respondent takes exception to the finding in the *Tembi* case.

The evidence supporting the Committee's finding in the *Tembi* case demonstrates that Respondent attached bogus letters to a motion he filed with the BIA on June 9, 1999, seeking to withdraw as counsel for Ms. Tembi. The text of the bogus letter, dated March 26, 1999, contains the sentence "[w]hile we are prepared to file the brief [on Ms. Tembi's appeal], we will not do so until you pay the balance of your initial case." BX 5I. The evidence that Ms. Tembi, in fact, had paid him the balance owed "on her initial case"

is the eye-witness testimony of both Ms. Tembi and a friend of Ms. Tembi,

Doris Yunmbam, who had helped Ms. Tembi by soliciting some of the $1,200 needed to pay the fee from "members of the Cameroonian immigrant community." Finding 76. The Hearing Committee credited that eye-witness testimony. *Id.* The Committee thus found the letter not only is bogus in the sense that it was not sent to Ms. Tembi, but also in that it contains a false statement.

The ostensible reason Respondent filed the letter with his motion was to represent to the BIA that he had given Ms. Tembi fair warning that he would withdraw from her appeal and thus enhance the chances that the BIA would allow him to withdraw. As is previously discussed in this report, *supra*, pp. 1135–39, our conclusion is that his withdrawal, along with his failure to file a brief, was an abandonment of his client in violation of Rule 1.3(b). Filing the deceitful letter in support of the motion and sending a letter to INS that falsely stated that "Ms. Tembi had incorrectly sent the money [for her $500 bond] to the Immigration Court rather than [the INS]," BX 5E, when in fact she had given Respondent the money in his office, were violations of Rule 3.3(a)(1). *See supra*, pp. 1140–41. Those false letters also involved

---

10. Bar Counsel also contends that the evidence establishes that Respondent violated Rule 3.3(a)(2) by directing his client, Owanate Davies to "submit a false doctor's note to immigration authorities" and by directing his client Ms. Asegieme to present to INS a "false letter [stating] that [Ms. Asegieme] worked for Optimum Care," a medical care facility. Bar Counsel's Brief at 41.

We declined above to make Bar Counsel's requested finding that Respondent advised Owanate Davies to obtain a false medical note, because making such a finding would require us to make a credibility assessment. *See supra*, p. 1134. For the same reason here, we decline to find that Respondent violated Rule 3.3(a)(2). As for the false letter in the *Asegieme* case, the Hearing Committee discusses Bar Counsel's contention that Respondent "engaged in fraud, misrepresentation or dishonesty or counseled Ms. Asegieme to do so" and concludes "there is not sufficiently clear and convincing evidence to find a violation." HC Report at 37. We reject Bar Counsel's contention for the reasons stated by the Committee.

"dishonesty, deceit, fraud and misrepresentation" and thus violated Rule 8.4(c).

Respondent contends that the "evidence ... falls short of proving by clear and convincing evidence th[at] Respondent violated Rule 8.4 and the finding is not supported by substantial evidence in the record as a whole." Brief of Respondent in Support of Exception to the Report and Recommendation of the Ad Hoc Hearing Committee ("Respondent's Brief") at 3. He maintains that "the conclusion regarding the violation of Rule 8.4(c) is a legal conclusion" and that the Board thus "is not bound by the findings of the Hearing Committee." *Id.* at 6. The findings that Respondent violated Rule 8.4(c), however, are logical inferences from the Hearing Committee's findings of subsidiary fact that Ms. Tembi gave the $500 bond money to his office on the day it had to be filed with the INS and that she paid him in full for his services during her Immigration Court hearing. We accept those findings and conclude that the disciplinary violations they support have been established by clear and convincing evidence.[11]

Bar Counsel's contentions regarding a Rule 8.4(c) violation in the *Owanate Davies* case are based upon findings that the Hearing Committee did not make and that we reject for the reasons stated *supra*, pp. 1134–35. His contentions regarding a Rule 8.4(c) violation in the *Asegieme* case were rejected by the Hearing Committee on the ground that, with "conflicting and uncorroborated testimony" on the charge, "there is not sufficiently clear and convincing evidence to find a violation." HC Report at 37. We agree that the charge is not supported by clear and convincing evidence.

### RULE 8.4(D)—SERIOUS INTERFERENCE WITH THE ADMINISTRATION OF JUSTICE

Rule 8.4 provides that "[i]t is professional misconduct for a lawyer to ... engage in conduct that seriously interferes with the administration of justice." The Court's opinion in *In re Hopkins*, 677 A.2d 55, 60–61 (D.C.1996), gives three criteria that conduct must meet for a violation of Rule 8.4(d). "First ... the conduct must be improper," either because it is prohibited by a "statute, court rule or procedure, or other disciplinary rule" or "simply be-

---

11. Respondent argues that his testimony that Ms. Tembi owed him legal fees for her hearing in the Immigration Court and that she did not give him the $500 bond money is more credible than Ms. Tembi's testimony and that of Doris Yunmbam. On questions concerning subsidiary facts, we defer to the findings of the Hearing Committee, if they are supported by substantial evidence in the record as a whole. *See In re Frank, supra* at 16. The Committee's findings that Ms. Tembi paid Respondent in full for her Immigration Court hearing and delivered the $500 bond payment to Respondent in his office are supported by substantial evidence and based upon the Committee's assessment of the credibility of the witnesses. We therefore accept those findings.

Respondent also suggests that the Hearing Committee did not consider the possibility that the two letters he filed with his motion to withdraw from Ms. Tembi's appeal were lost in the mail as "an explanation for Ms. Tembi's failure to receive[] the letters." Respondent's Brief at 5. The Board, like the Court, "adheres to the presumption that letters mailed through the United States Post Office are delivered and received at the address sent." *So v. 514 10th Street Assocs., L.P.*, 834 A.2d 910, 914 (D.C.2003). That presumption has extra weight in this case in which there are two separate mailings. Absent evidence rebutting the presumption, we thus find the Hearing Committee did not err, even if as Respondent posits, the Committee did not consider the possibility that Respondent's two letters were lost in the mail as a reason Ms. Tembi did not receive them.

cause, considering all the circumstances in a given situation, the attorney should know that he or she would reasonably be expected to act in such a way as to avert any serious interference with the administration of justice." *Id.* at 61. The second criterion is that "the conduct itself must bear directly upon the judicial process (*i.e.,* the 'administration of justice') with respect to an identifiable case or tribunal." *Id.* Finally, the "conduct must taint the judicial process in more than a *de minimis* way." *Id.* The Court explained its third criterion as requiring that the conduct "at least potentially impact upon the process to a serious and adverse degree." *Id.*

The evidence meets those criteria in this case. "[D]eliberate failure to file an appeal" was held a violation of Rule 8.4(d) in *In re Drew,* Bar Docket No. 228–94 (BPR Nov. 18, 1996), *adopted,* 693 A.2d 1127, 1133 (D.C.1997) (per curiam) (appended Board Report). Respondent's deliberate failing to file a brief in the *Tembi* case was improper conduct that bore directly upon the judicial process of the BIA with respect to an identifiable case and had a serious and adverse impact upon that process. As the Hearing Committee found, the BIA dismissed Ms. Tembi's appeal, specifically relying "on the fact that although Respondent had indicated a written brief would be filed, no such brief was ever filed." Finding 86. The three *Hopkins* criteria thus have been satisfied in the *Tembi* case, and the clear and convincing evidence establishes that Respondent violated Rule 8.4(d) in that case.

Bar Counsel maintains that Respondent's failure to appear for scheduled court hearings and INS interviews in the *Madagu, Owanate Davies* and *Asegieme* cases also constituted violations of Rule 8.4(d). In support, she quotes the statement in the Court's comment to Rule 8.4 that "[a] lawyer's failure to appear in court for a scheduled hearing is [a] common form of conduct deemed prejudicial to the administration of justice." Rule 8.4, Comment 4. The Hearing Committee refused to find that Respondent's failure to appear for those hearings and interviews were intentional failures to seek the objectives of his client and thus refused to find violations of Rule 1.3(b). The Committee, apparently for the same reason, did not find that those failures seriously interfered with the administration of justice in violation of Rule 8.4(d). *See* HC Report 32, 35, 37 and 39.

Rule 1.3(b) violations are predicated upon intentional conduct. The rule forbids "intentionally ... fail[ing] to seek the lawful objectives of a client" or "intentionally ... prejudic[ing] a client." Rule 8.4(d), on the other hand, is not limited by its terms to intentional conduct, and the Court in *Hopkins* focused more on the character of the conduct than on the state of mind of the lawyer. The Court held that "improper" conduct with the requisite effect on the administration of justice violates Rule 8.4(d), and went on the explain that conduct can be improper "either because it is prohibited by a 'statute, court rule or procedure, or other disciplinary rule'" or "simply because, considering all the circumstances in a given situation, the attorney should know that he or she would reasonably be expected to act in such a way as to avert any serious interference with the administration of justice." *Hopkins,* 677 A.2d at 60–61.

The question under Rule 8.4(d) in the *Madagu, Owanate Davies* and *Asegieme* cases thus is whether Respondent, considering all the circumstances, knew or should have known that he would reasonably be expected to appear at the scheduled hearing or interview and should have made a greater effort to see that another lawyer competent to handle the matter did

appear. We find that the clear and convincing evidence establishes both those factors in the *Owanate Davies* and *Asegieme* cases, but neither factor in the *Madagu* case.[12] Moreover, in the Owanate Davies and Asegieme cases, Respondent's failure to appear bore "directly upon the judicial process ... with respect to an identifiable case" and "at least potentially impact[ed] upon the process to a serious and adverse degree." *Hopkins*, 677 A.2d at 61. Accordingly, we find that Respondent violated Rule 8.4(d) with respect to those two cases, as well as the *Tembi* case.

## III. Sanction

The Hearing Committee recommends that Respondent be suspended for eighteen months and required to return his fees to three of his clients in the cases under review and demonstrate his fitness to practice law in order to resume practice in the District of Columbia. We agree that a suspension with restitution and fitness conditions is appropriate in this matter, but we recommend that the suspension be for one year.

The Court has instructed that "all relevant factors" are to be reviewed in recommending an appropriate sanction, including the nature of the violation, the mitigating and aggravating circumstances, the need to protect the public and the moral fitness of the attorney. *In re Slattery*, 767 A.2d 203, 214–15 (D.C.2001). We also look to previously decided cases so that our recommended dispositions do not "foster a tendency toward inconsistent dispositions for comparable conduct." *See* D.C. Bar R. XI, § 9(g)(1).

In our report in *In re Cater*, BDN 337–99, 139–01, 372–01 and 428–01 (BPR June 26, 2003) (pending appeal), we recognized that "the sanctions of suspension and fitness address different objectives." *Id.* at 24. Suspensions are based upon "*past* misconduct," and the "length of suspension is related to the severity of the misconduct and, thereby, serves as a deterrent. The fitness requirement ... addresses *future* behavior and is imposed when, after passage of the term of suspension, 'substantial questions remain about respondent's fitness to practice law.'" *Id.* (quoting *In re Robinson*, 736 A.2d 983, 990 (D.C.1999)) (emphasis in original).

### Length of Suspension

The immigration matters that the Hearing Committee looked to in support of its sanction recommendation involved relatively short suspensions. The respondent in *In re Ryan*, who committed multiple violations in connection with five client representations, including "three separate instances of intentional prejudice or damage to a client," was suspended for four months. *In re Ryan*, 670 A.2d 375, 379, 381 (D.C.1996). Six years after the Court's decision in *Ryan*, the Board, in *Perez*—a case involving an immigration lawyer found to have committed "multiple instances of neglect, failure to pursue a client's lawful objectives and intentional prejudice or damage relating to a single client"—looked to *Ryan* "as setting the outer limit for an appropriate sanction in this case." *In re Perez*, BDN 40–00 at 4 (BPR June 14, 2002), *aff'd*, 828 A.2d 206 (D.C.2003) (per curiam). The suspension

---

**12.** Respondent testified that his failure to attend Madagu's interview, which was Madagu's first interview concerning his asylum claim, was due to the fact that, under the INS procedures, postponements of an asylum claimant's first interview were "automatic," and he thought Madagu could go by himself and get the postponement. Unbeknownst to Respondent, a new rule had been adopted under which failure to appear with counsel at the first interview would be grounds for immediate referral of the claim to the Immigration Court, which is what happened in Madagu's case. *See supra*, pp. 1122–24.

recommended in *Perez* was 60 days. *In re Owusu,* BDN 109–02 (July 30, 2004) (pending appeal), another case in which the respondent was an immigration lawyer, the Board followed *Perez* and recommended a 60–day suspension. We described the *Owusu* case as "involve[ing] multiple instances of neglect in the course of a representation, failure to pursue a client's lawful objectives and intentional prejudice or damage to a client." *Id.* at 19. Other decisions in cases involving neglect and intentional prejudice to clients in other fields of law impose suspensions of not much longer periods. *See, e.g., In re Starnes,* 829 A.2d 488 (D.C.2003) (per curiam) ("systematic and serious neglect of three client matters," 6–month suspension); *In re Lewis,* 689 A.2d 561 (D.C. 1997) (per curiam) (abandonment of a criminal defendant, 30–day suspension); *In re Steele,* 630 A.2d 196 (D.C.1993) (serious neglect of Small Claims matter, 60–day suspension). On the other hand, in *In re Grimes,* 687 A.2d 198, 198 (D.C.1996) (per curiam), the Court adopted the Board's recommendation that the respondent be suspended for one year and required to demonstrate fitness and restitution of client fees "based upon the findings of three separate hearing committees that [the respondent] seriously neglected the interests of five different clients."

The relative gravity of Respondent's misconduct in comparison with the misconduct in the foregoing cases, especially Respondent's misconduct in the *Tembi* case, argues for a longer suspension than the suspensions imposed in the *Ryan, Perez, Owusu, Starnes* and *Lewis* cases. Ms. Tembi turned to Respondent to pursue a previously filed asylum claim based on her activities as a member of an opposition group in Cameroon. Respondent "did not sit down with [her] to understand the facts of her story in order to gather the corrobo-

rative evidence or to prepare her in any way for the hearing." Finding 72; *see also* 3 Tr. 18–19, 23–24. Ms. Tembi's asylum trial took place on October 15, 1998. Less than three weeks before that day, Respondent told her that he would not represent her at the trial "unless she paid the outstanding $1,200 balance she owed." Finding 75. Ms. Tembi raised that amount with her own wages and funds contributed by members of the Cameroonian immigrant community and paid Respondent on the morning of the hearing. The trial went badly, in the view of Ms. Tembi and a friend who came with her. But the appeal went worse. As has previously been recounted, Respondent noticed the appeal, failed to have Ms. Tembi's bond money delivered to the Immigration Court, did not file a brief on appeal when it was due in April 1998, and two months later filed a motion to withdraw that was supported by bogus documents purporting to be letters he wrote to Ms. Tembi and containing the false statement that she still owed him for her trial five months after she paid him his full fee for her case.

Bar Counsel urges that we recommend disbarment for Respondent or, in the alternative, suspension for three years with a fitness requirement. In its recent decision in *In re Steele,* 868 A.2d 146, 154–55 (D.C.2005), the Court imposed a three-year suspension for the respondent's misconduct in five separate representations. The misconduct included multiple instances of neglect coupled with multiple instances of deceit. In one representation, the respondent "repeatedly advised [his client] that he filed an opposition to the [defendant's] motion for summary judgment when he had not done so." *Id.* at 150. In another, he "fabricated" a subpoena that purported to compel his appearance in one court "as a justification for failing to appear" in another court. *Id.* at 151, 153.

The Court imposed a three-year suspension with a fitness requirement, which the Board had recommended, rather than disbarment, noting that with either sanction Respondent "will not be reinstated to practice law until he has demonstrated his fitness to do so." *Id.* at 154.

Other cases in which respondents have been disbarred or suspended for a number of years for intentionally false statements either to a tribunal or in a litigation context have involved multiple instances of deceit. *See, e.g., In re Corizzi,* 803 A.2d 438 (D.C.2002) (respondent counseled two clients to lie at their depositions); *In re Goffe,* 641 A.2d 458 (D.C.1994) (per curiam) (respondent disbarred because he "showed a pattern of dishonesty and fabrication of evidence over a number of years"); *see also In re Parshall,* Bar Docket No. 430–01 (BPR Feb. 18, 2005) (18–month suspension for Department of Justice lawyer who contrived a scheme, involving fabricated documents, to falsely represent to the court that the respondent had obtained settlement authority and offered to settle with opposing counsel when he had no authority and had made no offer, coupled with false statements to cover up his misconduct to his superior), *aff'd,* No. 02–BG–430, 878 A.2d 1253 (D.C. July 21, 2005) (per curiam).

In urging that Respondent's misconduct warrants disbarment, Bar Counsel relies upon *In re Foster,* 699 A.2d 1110 (D.C. 1997), a case that Bar Counsel himself describes as involving "significant prior discipline, multiple ethics violations, including neglect; lying to court and clients; failing to attend hearings, file pleadings, or keep clients informed; and refusing to participate in formal disciplinary proceedings." Bar Counsel's Brief at 46 n. 14. While the cases under review involve some of the same kinds of misconduct, the sheer number of serious violations makes *Foster,*

as well as *Corizzi, Goffe, Parshall* and the 2005 *Steele* case, significantly different cases than this matter. Still, dishonest conduct that involves deceit in court proceedings warrants a serious sanction. In *Steele,* the Court found "[o]f paramount importance" in the imposition of a three-year suspension "the unequivocal evidence showing dishonesty by respondent in his representations to a judge, other lawyers, and to his clients." *Steele,* 868 A.2d at 154. *But see In re Chisholm,* 679 A.2d 495 (D.C.1996) (6–month suspension with fitness requirement for abandonment of immigration client for more than five years and "persistent intentional dishonesty," resulting in needless incarceration of the client).

The array of precedent for suspensions measured in months rather than years for neglect in cases involving practice in immigration law, as well as in other fields of law, even when the neglect is accompanied by intentional and dishonest conduct, counsels against the appropriateness of more lengthy sanctions in this matter. What is more, the cases in which disbarment or multi-year suspensions have been imposed for violations of the kind Respondent committed involve misconduct that exceeds Respondent's misconduct in gravity and frequency. Bar Counsel's contention for a three-year suspension rests, in good part, upon his contention that the evidence establishes dishonest conduct of Respondent not only in the *Tembi* case, but also in two of the other cases under review. The Hearing Committee did not find dishonest conduct proved by clear and convincing evidence in any case but the *Tembi* case, and neither do we. We therefore reject Bar Counsel's contention that disbarment or a multi-year suspension is warranted in this matter.

We also reject Respondent's position that "a suspended sanction conditioned on

probation to include supervision by a practice monitor and continuing legal education would protect the public by correcting the problems which caused the violations...." Respondent's Brief at 7. Respondent might well benefit from continuing legal education and consultation with appropriate experts regarding practice management, and Respondent's voluntary steps in those directions are commendable. But we deem the problems underlying Respondent's misconduct far more serious than "his overextended practice," *id.*, even though "overextended" his practice appears to be.[13]

Considering all the factors bearing on the sanction, including Respondent's *pro bono* services, and Respondent's prior discipline of a 30–day suspension the imposition of which was suspended in *In re Ukwu*, 712 A.2d 502 (D.C.1998) (per curiam), and his informal admonition in September 2001 (for failure to provide a client with a writing setting forth the basis or rate of his fee (BX 7B)), we conclude that a suspension for one year is warranted by Respondent's misconduct in this matter and is more consistent with the sanctions imposed upon comparable misconduct in other cases than a longer suspension would be.

### FITNESS REQUIREMENT

In *Cater*, we concluded that "the most appropriate standard [for imposing a fitness requirement] is whether there exists a 'serious doubt' of a respondent's fitness to practice law." *Cater, supra* at 26. Elaborating on that standard we wrote that before imposing a fitness requirement, "the record in the disciplinary proceeding must contain clear and convincing evidence that casts a serious doubt upon the attorney's continuing fitness to practice law." *Id.* Moreover, we added that "[i]n determining whether serious doubt is raised ... it is instructive to consider the five *Roundtree* factors used for evaluating petitions for reinstatement," a process that the Court has often employed in making decisions about the appropriateness of a fitness requirement. *Id.* at 27; *see, e.g., Chisholm*, 679 A.2d at 503; *Steele*, 630 A.2d at 201.

The *Roundtree* factors are derived from the Court's opinion in *In re Roundtree*, 503 A.2d 1215 (D.C.1985). They were stated by the Court in that case as follows:

---

13. Respondent's argument for a suspended sanction relies on the decision in *In re Mance*, 869 A.2d 339 (D.C.2005) (per curiam), a case in which, as Respondent reports, "[t]he Board recommended and [the] Court approved a stay of imposition of a suspension in favor of probation for an attorney whose multiple disciplinary violations were attributable to his overwhelming caseload at the time of the events at issue." Respondent's Brief at 7. The violations found in that case were violations of Rule 1.1(a) and (b), 1.3(a) and (b), 1.4(a), 1.16(a)(3) (mandatory withdrawal upon discharge) and 8.4(d), all of which arose from the respondent's representation in a single case and based upon events that were " 'by all accounts, an aberration.' " *Mance*, 869 A.2d at 343 (quoting Board report). The sanction imposed was a "thirty-day suspension." *Id.*

at 341. In discussing the Board's decision to recommend a stay of the sanction, the Court described the Board's reasoning as follows:

> Attributing respondent's violations to his "overwhelming case load at the time of the events at issue," and taking into account respondent's "excellent reputation" and "lengthy history" as a criminal practitioner and the absence of any prior similar discipline in his record, the Board believes it would be proper "to assure the protection of the public by addressing specifically the circumstances which brought about the misconduct through probationary conditions."

*Id.* at 342.

> We do not find the circumstances in *Mance* analogous to the facts in this matter.

 

(1) the nature and circumstances of the misconduct for which the attorney was disciplined; (2) whether the attorney recognizes the seriousness of the misconduct; (3) the attorney's conduct since discipline was imposed, including the steps taken to remedy past wrongs and prevent future ones; (4) the attorney's present character; and (5) the attorney's present qualifications and competence to practice law.

*Id.* at 1217.

### A. *Nature and Circumstances of the Misconduct*

Respondent's conduct can be summarized as five immigration law representations in which he did not exercise the thoroughness and preparation reasonably necessary for the representation, did not serve his client with the skill and care commensurate with that generally afforded to clients by other lawyers in similar matters, did not represent his client zealously and diligently and did not keep his client reasonably informed about the status of a matter or explain a matter to the extent necessary to permit the client to make informed decisions. In addition, in one of those matters, the *Tembi* case, Respondent intentionally did not seek the lawful objectives of a client by failing to file a brief with the BIA in an appeal he had noticed, withdrawing from the appeal without advising his client and justifying that withdrawal with an intentional misrepresentation to the appellate tribunal.

Respondent's worst misconduct, both on the scale of morality and of injury to his client, occurred in the *Tembi* case, which has been discussed above, from various perspectives, in our analyses of Respondent's violations of Rule 1.3(b), 3.3(a)(1), 8.4(c) and 8.4(d). *See supra*, pp. 1135–40, 1140–46, & 1141–43. Those four rule provisions, violated by Respondent's abandonment of his client Ms. Tembi and the misrepresentations with which that abandonment was carried out, point to the four ideals that the lawyer's disciplinary system should strive the hardest to promote—devotion to the client's legitimate interests (Rule 1.3(b)), candor toward the tribunal (Rule 3.3(a)(1)), honesty in dealing with others (Rule 8.4(c)) and respect for the administration of justice (Rule 8.4(d)).

But the aspects of Respondent's misconduct that bear most heavily on his fitness to practice law are (1) his intentional misrepresentations and abandonment in the *Tembi* case, and (2) his consistent neglect in all five cases to prepare his clients for official interviews and court hearings in political asylum cases. Virtually all immigration clients are "strangers in a strange land." 3 Tr. 159 (Maggio). But in cases in which the client is seeking political asylum in the United States, as the expert witness called by Bar Counsel testified, the client "is someone who is pleading for their freedom, for their life." 3 Tr. 155. As a consequence in those cases, "you have to take considerable care to prepare your client. Your have to sit down and understand the facts of their case. You have to put together corroborative evidence. You have to usually prepare an affidavit laying [out] your client's case both so that the trial [judge] will see it in writing and also to aid your client to get everything straight and to help yourself getting the case straight." *Id.* at 155–56 (Maggio). The evidence in this matter establishes that in four political asylum cases—*Madagu,* the two *Davies* cases and the *Tembi* case—Respondent did none of the preparation necessary to serve his clients' interests. We regard these persistent failures,

together with Respondent's intentional violations under Rules 1.3(b), 3.3(a)(1), 8.4(c) and 8.4(d), as raising considerable question concerning his fitness to practice law.

### B. *Recognition of the Seriousness of His Misconduct*

Respondent denied most of the misconduct that formed the basis of the charges in this matter, and in some important parts of the case, the Hearing Committee credited his testimony enough to conclude that serious charges of false statements to tribunals and dishonest conduct were not established by clear and convincing evidence. With respect to the charges that the Hearing Committee held were established by the evidence, we have no record on which to assess Respondent's recognition of their seriousness. His testimony concerning the changes in his practice that he has made while the disciplinary process has been pending gives some idea of his recognition of the seriousness of his misconduct, but one salient fact raises a serious question about the completeness of his efforts to reform his practice. As the Hearing Committee pointed out, "even as the hearings ... were ongoing, one of Respondent's current clients had an immigration hearing at which neither the client nor a back-up attorney appeared, leading the Immigration Judge to conclude that the client's matter had been abandoned." [14] HC Report at 44.

### C. *Steps Taken to Remedy Past Wrongs and Prevent Future ones*

There is no evidence that Respondent has taken any steps to remedy his past wrongs. With respect to preventing future wrongs, the Hearing Committee pointed to his testimony that "since the time of the events in these matters he has come to recognize the practice of allowing clients to appear at immigration proceedings without counsel when he was not available to appear was a poor one." HC Report at 44. He also "has sought to improve his practice management by having more concrete arrangements in place to cover his court responsibilities when he is on travel and by assigning a paralegal to manage his calendar." *Id.* The Hearing Committee concluded, however, that "we are concerned about Respondent's competence and see no basis for concluding either that the problem has been resolved or that any of the remedial measures Respondent has undertaken have been effective." HC Report at 48.

### D. *Respondent's Present Character*

The Hearing Committee recognized the "fact that during the course of his career Respondent has frequently provided and continues to provide representation on a pro bono basis to various clients" HC. Report at 44. No direct evidence of Respondent's character was introduced in Respondent's hearing. At the end of his hearing on June 2, 2004, after the Committee had conferred and announced its pre-

---

**14.** Respondent testified as follows:

Q. [I]sn't it true that on the second day of this disciplinary hearing, April 14th, 2004, you failed to appear in connection with one of your client matters? Specifically, Tabugbo Adogu. Didn't he have a matter before [the] immigration court on April 14 th, and didn't Judge Barrett deem his matters abandoned because neither he nor you appeared in court that day?

A. During my presence here, his case came up. And of course, based on my new rules in place, he came in and we discussed it and I told him that I was going to be engaged on this day. He specifically said that he would go by himself. But, unfortunately, he took ill and he brought me a doctor's paper that he was sick.

4 Tr. 269 (Respondent).

liminary, nonbinding decision that some of the violations charged had been established and Bar Counsel had submitted his evidence in aggravation, Respondent stated that he intended to submit evidence in mitigation in the form of documentary evidence and requested that the record be kept open. 4 Tr. 325–29. The Chair agreed that the record would be kept open and left the date of closing to be agreed upon by the parties. *Id.* Closing of the record ultimately was set for July 19, 2004. Hearing Committee Order dated July 12, 2004. On that date, Respondent filed a Motion to Keep the Record Open for Submission of Evidence on Mitigation, in which he wished to submit what he referred to as "evidence in the nature of character evidence." Respondent's Motion dated July 19, 2004. In that motion, Respondent described the evidence he wished to submit as follows:

> By way of proffer, Respondent would present evidence from several former and present clients whom he has represented in immigration proceedings either on a *pro bono* or a reduced fee basis. These clients would further testify that Respondent was successful in assisting them to achieve their goal of remaining [in] this country. The testimony would show that some of these matters were quite protracted in nature, lasting over several years. The evidence would demonstrate that Respondent would keep in appropriate communication with his clients, and would have the clients and their witnesses well prepared for the various proceedings involved.

The Committee Chair, after receiving Bar Counsel's opposition, denied the motion but stated that "[t]he Committee will accept as credible Respondent's uncontradicted testimony that in the past he has frequently provided, and currently continues to provide, pro bono legal representation to various clients." Hearing Committee Order dated July 23, 2004. Respondent has taken no exception to that ruling.

### E. Present Qualifications and Competence to Practice Law

Respondent's present qualifications and competence were seriously challenged at the hearing by Bar Counsel, the expert witness he called and the lawyers who were retained by Respondent's clients after they terminated their relationship with him. The Hearing Committee emphatically wrote that "[w]e have no doubt that Respondent's knowledge and skill as an immigration lawyer leave much to be desired." HC Report at 41.

The Hearing Committee explained its recommendation of a fitness requirement as follows: "In comparing similar immigration matters where a fitness requirement has been imposed and sustained, we see no basis for not imposing one here as well." *Id.* at 48, citing *Perez,* 828 A.2d 206; *Owusu,* Bar Docket No. 109–02; *Ryan,* 670 A.2d 375. We agree that a fitness requirement is consistent with sanctions imposed in these cases, as well as others cited *supra,* pp. 1147–50. Our review of the *Roundtree* factors also leads us to conclude that the clear and convincing evidence establishes a serious doubt about Respondent's fitness to practice law, particularly in the unforgiving milieu of the immigration field.[15] Reading his testi-

---

15. Respondent's resumption of the practice of law will depend upon his establishing, among other things, that he has the "learning in law required for readmission." D.C. Bar R. XI, § 16(d). Continuing legal education courses in the fields of law in which he wishes to practice may assist him in establishing that criterion.

mony does not leave us with the feeling that he is irretrievably unfit, but the casual attitude he has taken toward the five representations that are the subject of this matter, his customarily low level of devotion to his clients' interests and his willingness to abandon his client who is facing deportation from the United States establish by clear and convincing evidence serious doubt of his fitness to practice law.

### IV. CONCLUSION

The Board recommends that Respondent be suspended from the practice of law for one (1) year and that as conditions of his reinstatement he be required to (1) establish his fitness to practice under D.C. Bar R. XI, § 16 and (2) pay restitution in the amount of $2,000 to Michael Madagu, $5,855 to Toyin Asegieme and $2,000 to Esther Tembi, with interest of 6 percent per annum from the date of each client's payment.

BOARD ON PROFESSIONAL RESPONSIBILITY

/s/ James P. Mercurio

Dated: July 29, 2005

All members of the Board concur in this Report and Recommendation except Mr. Williams, Ms. Helfrich, and Dr. Payne, who did not participate.